UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

INJAH TAFARI,

                        Plaintiff,

                                    9:07-CV-0654
v.                               (DNH/GHL)

K. MCCARTHY, et al.,

                        Defendants.
_____

APPEARANCES:                      OF COUNSEL:

INJAH TAFARI, 89-A-4807
Plaintiff *pro se*
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953

HON. ANDREW M. CUOMO          ADRIENNE J. KERWIN, ESQ.
Attorney General for the State of New York
  Counsel for Defendants
The Capitol
Albany, New York 12224

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER[1]

      This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable David N. Hurd, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Injah

Tafari alleges that the twenty-one named Defendants, all employees of the New York State

_____

      [1]     My thanks to Kara J. Krueger, a second year student at Syracuse University
College of Law, for her assistance in researching and drafting the Report-Recommendation on
Defendants' motion for summary judgment.

Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, destroying his personal property, interfering with his outgoing mail, restricting his ability to file grievances, denying him medical care, subjecting him to inhumane conditions of confinement, denying him Kosher meals, and falsely finding him guilty of disciplinary rules. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Dkt. No. 75), Plaintiff's motion to file a second amended complaint (Dkt. No. 84), and Plaintiff's motion to appoint counsel (Dkt. No. 93). For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part and order that Plaintiff's motions be denied.

## I.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.     Applicable Legal Standards

#### 1.     Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 585-86 (1986).  Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008).

     2.    <u>Legal Standard Governing Motions to Dismiss for Failure to State a Claim</u>

     To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968) (citations omitted); *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").  Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

     A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted.  In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*,

---

     [2]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

"a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.

Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means

that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is *plausible* on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  "Determining whether a

complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial

experience and common sense . . .  [W]here the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct, the complaint has alleged - but it has not

shown - that the pleader is entitled to relief."  *Id.* at 1950 (internal citation and punctuation

omitted).

　　　"In reviewing a complaint for dismissal under [Rule] 12(b)(6), the court must accept the

material facts alleged in the complaint as true and construe all reasonable inferences in the

plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).

Courts are "obligated to construe a *pro se* complaint liberally."  *Harris v. Mills*, 572 F.3d 66, 72

(2d Cir. 2009).  However, "the tenet that a court must accept as true all of the allegations

contained in the complaint is inapplicable to legal conclusions.  Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*,

129 S. Ct. at 1949.

　　　Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not

dismiss without granting leave to amend at least once when a liberal reading of the complaint

gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112

(2d Cir. 2000) (internal quotation and citation omitted).  Of course, an opportunity to amend is

4

not required where the plaintiff has already amended the complaint.  *See Advanced Marine Tech.*

*v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 384 (S.D.N.Y. 1998) (denying leave to amend where

plaintiff had already amended complaint once).  In addition, an opportunity to amend is not

required where "the problem with [the plaintiff's] causes of action is substantive" such that

"better pleading will not cure it."  *Cuoco*, 222 F.3d at 112 (citation omitted).

      **B.**      **Urine and Feces Throwing Incident**

      On January 27, 2005, Plaintiff was awakened by the presence of a cold substance which

he later determined to be urine and feces. (Am. Compl. ¶ 17, 20; Pl.'s Dep. 15: 4-16, 16:15-20,

Mar. 18, 2008.)  Upon scanning his cell, Plaintiff discovered Defendant Sergeant C. Jewett

standing in his doorway with a white cup accompanied by Defendants Officers Kevin McCarthy

and L. Matthews.  (Am. Compl. ¶ 17.)  When Plaintiff inquired into Defendant Jewett's actions,

the Defendants laughed and Defendant Jewett said, "That asshole is now up for the count." (Am.

Compl. ¶ 18.)  Defendant McCarthy additionally stated, "You better start sleeping with your

hearing aid on because I am going to write you a misbehavior report every time you don't stand

up for the 6:30a.m. count."  (Am. Compl. ¶ 18.)  Defendant Matthews added, "Next time I'm

gonna kick [your] ass [if] you don't stand up for my count."  (Am. Compl. ¶ 19.)  Defendant

Officer C. Deleo then closed Plaintiff's cell door.  (Am. Compl. ¶ 19.)

      In a report filed after this incident, Defendant Jewett stated he threw a three ounce cup of

water on Plaintiff to wake him because Plaintiff  was "unresponsive to the officers during their

6:30am count."  (Dkt. No. 75-22 at 10.)

      Plaintiff does not allege that he suffered any physical injury as a result of this incident.

      Plaintiff reported the January 27 incident to Defendant Officer Thomas Farrell and

requested that the area supervisor be notified of the treatment he was receiving. (Am. Compl. ¶ 20.)  Defendant Farrell told Plaintiff that he would notify the area supervisor of his concerns. (Am. Compl. ¶ 20.)  Plaintiff also reported the incident to Defendant David Miller, who at that time was the acting Superintendent at Eastern, as he was making his rounds of the Special Housing Unit ("SHU") and showed Miller the bed linens soiled from Defendant Jewett's actions[3].  (Am. Compl. ¶ 21; Pl.'s Dep. 16:15-18.)  Defendant Miller told Plaintiff that a Captain would conduct an investigation, that he would be seen by medical personnel, and that he would be provided with a change of linen.  (Am. Compl. ¶ 21; Miller Decl., Dkt. No. 75-32 ¶ 3.)  Defendant Captain Patrick Griffin was sent to conduct the investigation later that day and allegedly looked into the cell without saying a word or requesting any of the assistance offered by Defendant Miller.  (Am. Compl. ¶ 22; Pl.'s Dep. 17:3-9.)  After this incident, Plaintiff's family called Glenn Goord, who was then the commissioner of DOCS.  He ordered that a more extensive investigation be conducted.  (Pl.'s Dep. 18:2-1-25.)

Defendant Jewett admits to throwing something on Plaintiff.  However, he claims the substance thrown was water, not urine and feces.  (Pl.'s Dep. 19:3-6; Jewett Decl., Dkt. No. 75-32 ¶ 9.)

I construe the complaint as asserting the following claims: (1) an Eighth Amendment excessive force claim against Defendant Jewett; (2) a failure to intervene claim against Defendants Matthews, McCarthy, and Deleo; (3) a supervisory claim against Defendant Miller; and (4) a claim that Defendant Griffin failed to properly investigate the incident.

---

[3]     In the declaration he filed in support of Defendants' motion for summary judgment, Defendant Miller does not mention whether or not Plaintiff showed him soiled sheets.

1.    <u>Excessive Force</u>

Plaintiff claims that Defendant Jewett exercised excessive force by throwing urine and feces on him while he was sleeping.  (Am. Compl. ¶ 70.)  Defendants argue that this claim should be dismissed because the force used was *de minimis*.  (Defs.' Br., Dkt. No. 75-34 at 15-16.)

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ...  whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantoness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  *Id.* at 7 (citation and quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response.  The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted).  In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action.  The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience

of mankind."  *Id.* at 9-10 (citation omitted).

The force used here was *de minimis*.  *See DeArmas v. Jaycox,* No. 92-CV-6139, 1993 U.S. Dist. LEXIS 1292, 1993 WL 37501 (S.D.N.Y. Feb. 8, 1993), *aff'd*, 14 F.3d 591 (2d Cir. 1993) (holding that punching an inmate in the arm and kicking inmate in the leg was *de minimis*)[4]; *Candelaria v. Coughlin,* 787 F. Supp. 368, 374-75 (S.D.N.Y. 1992) (pressing fist against inmate's neck causing inmate to lose breath was *de minimis* force); *Anderson v. Sullivan,* 702 F. Supp. 424, 426-27 (S.D.N.Y. 1988) (pulling on an inmate's arms and forcing inmate's face into cell bars was *de minimis* force); *Brown v. Busch,* 954 F. Supp. 588, 597 (W.D.N.Y. 1997) (holding that pushing and striking an inmate causing inmate to stumble into his cell was *de minimis* force).  The question, then, is whether the force used was "of a sort repugnant to the conscience of mankind."

For the purposes of this analysis I will view the evidence in the light most favorable to Plaintiff and assume that Defendant Jewett threw urine and feces, not water, on Plaintiff.  This conduct, while certainly repulsive, is not sufficiently severe to be considered "repugnant to the conscience of mankind."  *See Fackler v. Dillard*, No. 06-10466, 2006 U.S. Dist. LEXIS 61480, 2006 WL 2404498, at *1 (E.D. Mich. Aug. 16, 2006) (holding that an officer who threw a four-ounce cup of urine on an inmate which caused no physical injury "was not so grievous as to rise to the level of an Eighth Amendment violation."); *Benitez v. Ham,* No. 9:04-CV-1159, 2009 U.S. Dist. LEXIS 97495, 2009 WL 3486379 (N.D.N.Y. Oct. 21, 2009) (Mordue, J. and Lowe, M.J.) (holding that refusing to remove restraints around an inmate's wrists after knowing that it was

---

[4]      Defendants served a copy of this unpublished decision on Plaintiff with their moving papers.  (Dkt. No. 75.)

causing the inmate "'extreme pain' and 'severe swelling'" was not "repugnant to the conscience of mankind")[5]; *Murray v. Goord,* 668 F. Supp. 2d 344 (N.D.N.Y. 2009) (Scullin, J. and Peebles, M.J.) (holding that punching an inmate in the testicles and shoving inmate into cement was not "repugnant to the conscience of mankind"); *Perry v. Stephens,* 659 F. Supp. 2d 577, 582-83 (S.D.N.Y. 2009) (stating that slapping an inmate across the face several times is not the force "of a sort repugnant to the conscience of mankind"); *compare Rembert v. Holland,* 735 F. Supp. 733, 736 (W.D. Mich. 1990) (stating that no penological goal was furthered when an off-duty officer entered an inmate's cell, made sexual demands, and threw feces and urine on the inmate). Therefore, I recommend that the Eighth Amendment claim against Defendant Jewett be dismissed.

2.      Failure to Intervene

Plaintiff claims that Defendants Matthews, McCarthy, and Deleo violated his constitutional rights by failing to intervene before Defendant Jewett threw urine and feces on Plaintiff. (Am. Compl. ¶ 70.)  Defendants argue that this claim should be dismissed because none of the accused Defendants had a "reasonable opportunity" to intervene and should not be held liable. (Defs.'s Br. at 15-16.) Defendants are correct.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights.  *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citation omitted).  A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if

_____

[5]      The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

9

"(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable

person in the officer's position would know that the victim's constitutional rights were being

violated; and (3) the officer does not take reasonable steps to intervene."  *Id.* at 501 (citation

omitted); *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) ("Failure to

intercede to prevent an unlawful arrest can be grounds for § 1983 liability.").  "Whether an

officer had sufficient time to intercede or was capable of preventing the harm being caused by

another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable

jury could not possibly conclude otherwise."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.

1994).

As to Defendants Matthews and McCarthy, Plaintiff does not allege that either Defendant

Matthews or Defendant McCarthy threw the liquid substance on him, but rather that they failed

to stop Defendant Jewett from doing so. (Am. Comp. ¶ 17-19.)  It is undisputed that Defendants

Matthews and McCarthy were present in Plaintiff's cell at the time of the incident.  However,

given the brief and unexpected nature of the incident, both Defendants lacked reasonable

opportunity to stop the alleged violation. *See  Cusamano v. Sobek,* 604 F. Supp. 2d 416, 429

(N.D.N.Y. 2009) (excusing an officer  from liability "despite his presence, if the assault is

'sudden and brief,' such that there is no real opportunity to prevent it); *Parker v. Fogg,* No. 85-

CV-177, 1994 U.S. Dist. LEXIS 1696, 1994 WL 49696, at *30-31(N.D.N.Y. Feb. 17, 1994)

(holding that an officer is not liable for failure to intervene if there "was no 'realistic opportunity'

to prevent [an] attack [that ends] in a matter of seconds").[6]  The liquid throwing incident began

---

[6]      Defendants served a copy of this case on Plaintiff with their moving papers.  (Dkt.
No. 75-37.)

and ended within a matter of seconds, an increment of time too "sudden and brief" to give

Defendants a "realistic opportunity" to respond and intervene on behalf of the Plaintiff.

*Cusamano*, 604 F. Supp. 2d at 429 n. 9.  For these reasons, Defendants McCarthy and Matthews

cannot be held liable for their failure to intervene and the claims against them should be

dismissed.

As to Defendant Deleo, Plaintiff additionally alleges that Defendant Deleo failed to

intervene.  In his complaint, Plaintiff concedes that Defendant Deleo's only connection to this

incident was that he "closed [Plaintiff's] cell door back from inside the [console]." (Am. Comp. ¶

19.)  This claim does not rise to the level of a cognizable claim because Defendant Deleo was not

in Plaintiff's cell when the incident occurred and thus had no reasonable opportunity to intervene.

A defendant who is not in the vicinity of the alleged constitutional violation, especially an

isolated violation that occurs within seconds, cannot be held liable because he lacked reasonable

opportunity to intervene. *See Ford v. Moore,* 237 F.3d 156, 163 (2d Cir. 2001); *Cusamano,* 604

F. Supp. 2d at 429 n. 9.  Therefore, the claims against Defendant Deleo must be dismissed.

3.      Defendant Miller

Broadly construed, the complaint could be read as asserting a supervisory liability claim

against Defendant Miller.  Defendants have not addressed this claim.  I find that it is subject to

*sua sponte* dismissal.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.

11

1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).[7]  In order to

prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show

some tangible connection between the unlawful conduct and the defendant.[8]  If the defendant is a

supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of

command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her

personal involvement in that unlawful conduct.[9]  In other words, supervisory officials may not be

held liable merely because they held a position of authority.[10]  Rather, supervisory personnel may

be considered "personally involved" if they (1) directly participated in the violation, (2) failed to

remedy that violation after learning of it through a report or appeal, (3) created, or allowed to

continue, a policy or custom under which the violation occurred, (4) had been grossly negligent

in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the

rights of inmates by failing to act on information indicating that the violation was occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[11]

---

[7]     *Accord*, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987).

[8]     *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

[9]     *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).

[10]    *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

[11]    The Supreme Court's decision in *Ashcroft v. Iqbal*, __ U.S. ___, 129 S. Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon*.  *See Sash v. United States*, ___ F. Supp. 2d ___, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009).  However, without precedential guidance from the Second Circuit or this District, this Court is persuaded that here, where Plaintiff's claim is based upon deliberate indifference, the *Colon* categories apply.

Broadly construed, Plaintiff's complaint alleges that Defendant Miller failed to remedy his situation after learning of it.  This claim is without merit because

> [i]t has been held that an appropriate guiding principle for determining personal responsibility is where a grievance alleges an ongoing constitutional violation, the supervisory official who reviews the grievance is personally involved if he is confronted with a situation that he can remedy directly.  If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to remedy a violation.

*Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) (Hurd, J.) (internal quotation omitted).  Here, Defendant Miller was confronted with an alleged violation that had already occurred and was not ongoing.  Therefore, he is not personally responsible for failing to remedy the alleged violation.  Accordingly, I recommend that the Court dismiss this claim *sua sponte*.

4.   Defendant Griffin

Broadly construed, Plaintiff's complaint alleges that Defendant Griffin violated his constitutional rights by failing to conduct a thorough investigation of the incident.  Defendants have not addressed this claim.  I recommend that it be dismissed *sua sponte* because prisoners do not have a due process right to a thorough investigation of grievances.  *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 341-42 (S.D.N.Y. 2003).  Therefore, Defendant Griffin did not violate any constitutional right even if, as Plaintiff alleges, he failed to thoroughly investigate the incident.

**C.   Destruction of Personal Property**

Plaintiff alleges that on January 27, 2005, Defendant Officers Thomas Farrell and T.J. Brown removed Plaintiff from his cell to obtain his personal property. (Am. Compl. ¶ 23.) Plaintiff was escorted to the SHU day room where he noticed that all of his personal belongings

13

had already been opened and spread out on the table. (Am. Compl. ¶ 23.)  Plaintiff remained

restrained and was told to stay seated when he noticed a garbage can full of his personal items.

(Am. Compl. ¶ 24.); (Pl.'s Dep. 21:12-14.)  These items included: thirty-five manila envelopes,

5,000 writing papers, sixty-seven bars of Dial soap, two 100-count boxes of white envelopes, two

large manila envelopes with claim receipts, six large manila envelopes containing legal

documents, two hair ties and two hearing aids. (Am. Compl. ¶ 24.)  When Plaintiff reported this

incident to the area supervisor, Defendant T.J. Brown told Plaintiff, "I'll slap the living hell out

of you if you keep running your mouth." (Am. Compl. ¶ 25.)  Defendant Farrell then stated,

"Let's take that nigger back to his cell," and allegedly threatened to throw away Plaintiff's other

personal items.  (Am. Compl. ¶ 25.)  On the way back to his cell, Plaintiff complained to

Sergeant Pagnuchi about his items being thrown away, and some, but not all, of the items were

returned. (Pl.'s Dep. 29:1-13.)

　　　　Plaintiff alleges that Defendants Farrell and T.J. Brown violated his Fourteenth

Amendment rights by throwing away several of his personal belongings.  (Am. Compl. ¶¶ 23-

24.)  Defendants argue that Plaintiff's constitutional rights were not violated because a

meaningful post-deprivation remedy was available. (Defs.' Br. at 11.)

　　　　"[A]n unauthorized intentional deprivation of property by a state employee does not

constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth

Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,*

468 U.S. 517, 533 (1984) (emphasis omitted).  This Circuit has held that "confiscation . . . [does]

not constitute a Fourteenth Amendment violation for loss of property because of the availability

of state court post-deprivation remedies" in the New York penological system. *Koehl v.*

*Dalsheim,* 85 F.3d 86, 88 (2d Cir. 1996); *see also Parratt v. Taylor,* 451 U.S. 527, 544 (1981)

("Although the state remedies may not provide the respondent with all the relief which may have

been available if he could have proceeded under § 1983, that does not mean that the state

remedies are not adequate to satisfy the requirements of due process."), *overruled in part on*

*other grounds by Daniels v. Williams,* 474 U.S. 327 (1986).  After the alleged property

destruction occurred, Plaintiff could have pursued numerous forms of recourse, including

verbally complaining to supervisors and/or submitting a formal grievance.  Plaintiff verbally

reported the incident to Defendant T.J. Brown, but pursued no further administrative recourse

through the grievance process. (Am. Compl. ¶ 24.)  Thus, adequate postdeprivation remedies

were available to Plaintiff after the alleged deprivation, but Plaintiff simply chose not to pursue

those remedies.  I therefore find that Plaintiff's due process rights were not violated and

recommend that the Court dismiss this claim.

### D.      Mail Interference

Plaintiff alleges that he slid three manila envelopes under his door on January 27 to be

mailed in compliance with Eastern SHU outgoing mail procedures. (Am. Compl. ¶ 26.)  After

discovering that the envelopes had never reached their destination, Plaintiff filed mail tampering

complaints with the SHU staff.  (Am. Compl. ¶ 27; Pl.'s Dep. 35:8-15.) Defendant Griffin

conducted the investigation regarding this incident. (Am. Compl. ¶ 28.)  Defendants Officers

Alex Torres and McCarthy later admitted to Plaintiff that they had thrown away his envelopes to

"teach [Plaintiff] how to stand up for count." (Am. Compl. ¶ 29.); (Pl.'s Dep. 37:3-16.)  Plaintiff

complained to Defendant Miller about this incident. (Pl.'s Dep. 37:17-21.)

I construe the complaint as asserting the following claims: (1) an access to courts claim;

(2) a free speech claim; (3) a retaliation claim; (4) a claim that Defendant Griffin failed to investigate the matter properly; and (5) a claim of supervisory liability against Defendant Miller.

       1.    <u>Access to Courts</u>

Plaintiff alleges that Defendants McCarthy and Torres violated his Constitutional rights by throwing away his legal mail on January 27, 2005. (Am. Compl. ¶ 26-29.)

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir. 2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to affirm." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir. 1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F. Supp. 713, 725 (S.D.N.Y. 1993) (citing *Pickett v. Schaefer,* 503 F. Supp. 27, 28 (S.D.N.Y. 1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* Moreover, the Second Circuit has held that a single, isolated incidence of mail interference is not a cognizable claim under § 1983. *Govan v. Campbell,* 289 F. Supp. 2d 289, 297-98 (N.D.N.Y. 2003) (citing *Washington,* 782 F.2d at 1136 (prisoner states a claim where he "indicates an alleged continuing activity rather than a single, isolated instance.")).

Here, Plaintiff's complaint alleges only one incident of mail tampering. (Am. Compl. ¶ 26-29.)  In *Davis*, the Second Circuit dismissed an inmate's alleged denial of access to the courts because his evidence only established two incidents of deprivation and thereby failed to establish "an ongoing practice by prison officials of interfering with his mail." *Davis,* 320 F.3d at 352. Nothing in the record indicates that Plaintiff was subjected to more than one incident of mail interference and, as such,  he does not have a cognizable claim under § 1983.  Moreover, Plaintiff has failed to show any actual injury caused by this incident.  Plaintiff does not allege that his access to the courts was chilled or that his ability to legally represent himself was impaired. Without actual injury, the court cannot allow for a cognizable claim under § 1983. *Collins v. Goord,* 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)); *Howard v. Leonardo*, 845 F. Supp. 943, 946 (N.D.N.Y. 1994) (Hurd, M.J.).

 Because Plaintiff cannot establish more than one incident of mail tampering or that he suffered any actual injury as a result of the Defendants' conduct, I recommend that the Court dismiss his claim for denial of access to the courts.

    2.    <u>Free Speech</u>

I construe Plaintiff's complaint as alleging that the mail tampering incident also violated his constitutional right to free speech under the First Amendment.  Defendants argue that one incident of failing to send out Plaintiff's legal documents does not constitute a First Amendment claim. (Defs.' Br. at 3.)

The First Amendment protects an inmate's "right to the free flow of incoming and outgoing mail." *Dolberry v. Levine,* 567 F. Supp. 2d 413, 419 (W.D.N.Y. 2008) (citation omitted).  However, courts in the Second Circuit have never held an isolated incident of mail

tampering to violate an inmate's First Amendment rights.  *Id.*; *Davis*, 320 F.3d at 351.  Again, Plaintiff has alleged only one incident of mail tampering by Defendants and he incurred no actual injury as a result of their  conduct.  Based on these facts, this incident simply cannot raise a valid free speech claim under § 1983 and I recommend that the Court dismiss the claim.

       3.      <u>Retaliation</u>

Read broadly, I construe Plaintiff's complaint to allege that Defendant McCarthy threw out Plaintiff's legal mail in retaliation for reporting the urine and feces throwing incident earlier that day. (Am. Compl. ¶ 29.) Defendants have not addressed this claim.

Claims of retaliation find their roots in the First Amendment.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004).  Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights.  *See id*. at 381-83.  Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care.  *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).  As the Second Circuit has noted,

> [t]his is true for several reasons.  First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated.  Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.  This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action--in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes*, 239 F.3d at 492).

Here, there is no question that Plaintiff's conduct was protected by the Constitution because the First Amendment protects an inmate's "right to the free flow of incoming and outgoing mail." *Dolberry,* 567 F. Supp.  2d at 419 (citation omitted).  This right is well established in case law and is uncontroverted between the parties in the present matter.  Because Plaintiff has an established constitutional right, the next inquiry in a claim of retaliation is whether the Defendants took an "adverse action."

The Second Circuit defines "'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.'"  *Gill*, 389 F.3d at 381(quoting *Davis*, 320 F.3d at 353, *superceded by* 2003 U.S. App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (emphasis in original).  The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Id.* at 381.  Courts in this circuit have held that claims of mail tampering do not constitute adverse action. *See Rivera v. Pataki,* No. 04 Civ. 1286, 2005 U.S. Dist. LEXIS 2747, 2005 WL 407710, at *19 (S.D.N.Y. Feb. 7, 2005) (holding that several incidents of "actively prevent[ing] [plaintiff]

19

from mailing his documents ... did not constitute adverse action"); *Battice v. Phillip,* No. CV-04-669, 2006 U.S. Dist. LEXIS 53407, 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) ("allegations that [defendant] withheld [plaintiff's] mail ... do not constitute adverse actions."). Therefore, I recommend that the Court dismiss this claim *sua sponte*.

4.      Defendant Griffin

Read broadly, Plaintiff's complaint alleges that Defendant Griffin violated his constitutional rights by failing to conduct a thorough investigation of the incident.  Defendants have not addressed this claim.  I find that this claim is subject to *sua sponte* dismissal because prisoners do not have a due process right to a thorough investigation of grievances.  *Torres*, 246 F. Supp. 2d at 341-42.  Therefore, I recommend that the Court dismiss this claim.

5.      Defendant Miller

I construe Plaintiff's complaint to allege Defendant Miller, in his supervisory capacity, deprived Plaintiff of his constitutional rights with regards to the mail tampering incident. Defendants have not addressed this claim against Defendant Miller.

I find that this claim is subject to *sua sponte* dismissal  because Defendant Miller was not personally involved in the alleged violation.  The SHU mail policy required "inmates to place all outgoing mail under their cell doors, to be picked up by the S.H.U. officers on the midnight shift and taken to the chart office." (Miller Decl. ¶ 11.)  At the time of the mail tampering incident, Defendant Miller was the Superintendent of Eastern Correctional Facility. (Miller Decl. ¶ 1.) Plaintiff does not allege that Defendant Miller misplaced his mail, but rather that Defendant Miller failed look into the matter after Plaintiff complained to him. (Pl.'s Dep. 37:17-38:1.) Absent a showing that Defendant Miller personally played a role in the loss of Plaintiff's legal

20

mail, he cannot be held liable. *See Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987) ("Absent some personal involvement by [defendant] in the allegedly unlawful conduct of his subordinates, he cannot be held liable under section 1983."). Because Plaintiff does not allege that Defendant Miller lost his mail, I recommend that the Court *sua sponte* dismiss the claim against Defendant Miller.

### E.   Tobacco Incident

Plaintiff alleges that on March 7, 2005, Defendant Farrell escorted him to the recreation area and, once Plaintiff was secured, spit chewing tobacco in Plaintiff's face. (Am. Compl. ¶ 30; Pl.'s Dep. 42:14-19.) Plaintiff does not allege that any injury resulted from this incident. However he does allege that his request for medical treatment immediately after the incident was denied. (Am. Compl. ¶ 30.) Plaintiff alleges that he immediately reported this incident to Deputy Winlin[12] and requested a sick call, but that Defendant Farrell would not allow for one. (Pl.'s Dep. 43:10-25.)

I construe the complaint as asserting: (1) an Eighth Amendment excessive force claim against Defendant Farrell; and (2) an Eighth Amendment medical claim against Defendant Farrell.

### 1.   Excessive Force

Plaintiff alleges that Defendant Farrell violated his Eighth Amendment rights by spitting chewing tobacco in his face. (Pl.'s Br., Dkt. No. 80-1 at 2.) Defendants argue that this single incident does not constitute excessive force. (Defs.' Br. at 17.) Defendants are correct. As a matter of law, a single incident of spitting does not constitute excessive force. *See Greene v.*

---

[12]      Plaintiff has not named Deputy Winlin as a defendant in this action.

*Mazzuca,* 485 F. Supp. 2d 447, 451 (S.D.N.Y. 2007) (citation omitted) (holding that yelling, spitting at and threatening an inmate do not "rise to the level at which prevailing doctrine sets the constitutional bar to establish cruel and unusual punishment"); *Headley v. Fisher,* No. 06 CV 6331, 2008 U.S. Dist. LEXIS 37190, 2008 WL 1990771, at *14 (S.D.N.Y. May 7, 2008) (holding that spitting in plaintiff's face, slapping and pushing twice did not give rise to the claim of excessive force).[13]   Therefore, I recommend that the Eighth Amendment claim against Defendant Farrell be dismissed.

      2.    <u>Denial of Medical Care</u>

Plaintiff claims that Defendant Farrell denied him medical treatment after the tobacco incident. (Am. Compl. ¶ 30.)  Defendants have not addressed this issue.  I find that this claim is subject to *sua sponte* dismissal.

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted).  "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

Here, Plaintiff has not alleged and the evidence does not show that he suffered any physical injury as a result of this incident. As such, his condition fails to meet the objective prong

---

[13]    Defendants served a copy of this unpublished decision on Plaintiff with their moving papers.  (Dkt. No. 75-37.)

for medical indifference in that any injury he may have suffered was not "serious" and the court

need not address the second element of deprivation. For these reasons, I recommend that the

claim against Defendant Farrell for medical indifference be dismissed.

### F.    Grievance Restriction

Plaintiff filed 115 grievances against Eastern staff in the two-month period between

January 24, 2005 and March 24, 2005. (Defs.' Br. at 4).  On March 25, 2005, Defendant Inmate

Grievance Program Director Thomas Eagen served Plaintiff with a grievance restriction alleging

that he had acted in bad faith by inundating the program with multiple grievances. (Am. Compl. ¶

31; Pl.'s Dep. 45:8-11.)  Defendant Eagen's grievance restriction limited the number of

grievances Plaintiff was allowed to file to two per week. (Eagen Decl. at 3).  Plaintiff believes

that Eagen relied on false statements made by Defendants Miller, Inmate Grievance Program

Supervisor Kathleen Lucas and Sergeant Theodore Lucas.  (Am. Compl. ¶ 31.)  These

Defendants allegedly reported that Plaintiff had stated, "The war is on." (Am. Compl. ¶ 31; Pl.'s

Dep. 48:1-10.)  Plaintiff filed a grievance with Commissioner Glenn Goord about the restrictions

placed upon him by Defendant Eagen. (Pl.'s Dep. 46:1-14.)

Plaintiff claims that his access to the grievance program was unfairly restricted, that he

was denied access to the courts, and that Defendant Eagen prevented his grievances from being

fully exhausted on appeal. (Am. Compl. ¶ 33.)  Defendants argue that this claim should be

dismissed because Plaintiff has no constitutional right to file a grievance and Defendant Eagen

had sufficient information to determine that Plaintiff was abusing the grievance process. (Defs.'

Br. at 3-4.)  Defendants are correct.

Many states, including New York, have voluntarily instituted inmate grievance programs

to resolve problems between inmates and staff members. *Shell v. Brzezniak,* 365 F. Supp. 2d 362, 369-70 (W.D.N.Y. 2005).  While the First Amendment guarantees the right of access to courts, grievance programs were undertaken voluntarily and have no legal basis in the Constitution. Therefore these programs are not considered constitutional rights. *Cancel,* 2001 WL 303713, 2001 U.S. Dist. LEXIS 3440 at *9-10.  Thus, courts have consistently held that violations of those procedures or the state's failure to enforce them does not give rise to a claim under § 1983. *Id.* at *10 (citations omitted).

Moreover, there is sufficient evidence to establish that Plaintiff was abusing the grievance program.  Plaintiff filed an exorbitant amount of grievances, 115 in a two month period, most of which were deemed frivolous, which gave Defendants appropriate justification for restricting Plaintiff's access to the program. Plaintiff has no right to abuse a voluntarily instituted program and delay the valid claims of other inmates.   If Plaintiff had been completely prohibited from filing grievances, he may have had a claim.  However, Plaintiff was still permitted to file two grievances per week under the restriction, which is a sufficient means of redress.  For the above reasons, I recommend that this claim be dismissed.

### G.    Bus Incident

Plaintiff alleges that on June 27, 2005, Defendant Officers A. Sisilli and R. Riester used excessive force on him and that he was denied medical care after the incident.  (Am. Compl. ¶¶ 37-40.)

The parties agree that on June 27, 2005, Plaintiff was escorted to the Downstate Correctional Facility draft room to wait for the bus to Eastern Correctional Facility. (Am. Compl. ¶ 34; Pl.'s Dep. 55:4-7.)  Defendant Sisilli searched and restrained Plaintiff and ordered him to

24

remain seated until the bus' departure. (Am. Compl. ¶ 34.); (Pl.'s Dep. 55:8-18.)

Plaintiff alleges that when he began to speak to the inmate next to him, Defendant Sisilli yelled violently at Plaintiff, "Hey you fucking asshole, on the fucking noise, there's no fucking talking while I'm [tying] inmate up." (Am. Compl. ¶ 35.) Plaintiff replied, "Excuse me, Officer I am not talking loud disturbing anyone, I'm [speaking] to the man [tied] up next to me quietly." (Am. Compl. ¶ 35.) Defendant Officer R. Riester then told Plaintiff to, "Shut the fuck up, I don't want to hear your mouth at all asshole." (Am. Compl. ¶ 36.) Defendant Sisilli then added, "I don't care how low you are talking, keep your fucking mouth [closed]." (Am. Compl. ¶ 36; Pl's Dep. 55-56.)

According to Defendants, Defendant Sisilli gave Plaintiff several direct orders to stop talking but Plaintiff refused to stop talking and used profanities. (Sisilli Decl. ¶ 5; Riester Decl. ¶¶ 6-7.) Defendant Riester asked Plaintiff for his identification number several times. Plaintiff "refused each time, using profanities." (Riester Decl. ¶ 8.)

The parties agree that thereafter, Defendants removed all inmates except Plaintiff from the draft room. (Pl.'s Dep. 56:11-17; Sisilli Decl. ¶ 7; Riester Decl. ¶ 9.) According to Defendants, they asked Plaintiff again for his identification number. (Sisilli Decl. ¶ 8.) Plaintiff responded by saying "when we get to Eastern the chains will come off and we are going to roll." (Riester Decl. ¶ 10.) Both Defendants declare that they "then escorted the plaintiff to the bus without incident." (Sisilli Decl. ¶ 8; Riester Decl. ¶ 11.)

Plaintiff's version of events in the draft room is quite different. He alleges that Defendant Sisilli grabbed him by his hair and rammed his head into the plastic covering over the holding pen repeatedly. (Am. Compl. ¶ 37; Pl's Dep. 56:19-24.) Plaintiff turned his head to avoid injury

25

to his face which resulted in the ramming of his shoulders into the plastic covering. (Am. Compl. ¶ 37.) Plaintiff claims that Defendant Sisilli repeated this assault approximately ten to fifteen times and then threw Plaintiff to the floor where Defendant Riester began to kick Plaintiff while he was restrained. (Am. Compl. ¶¶ 37-38; Pl's Dep. 58:1-16.) According to Plaintiff, the incident lasted for anywhere between thirty and sixty seconds. (Pl.'s Dep. 58:16.) Defendant Sisilli then pulled Plaintiff from the floor by his hair, which resulted in two dreadlocks being torn from his scalp. (Am. Compl. ¶ 39.) Once Plaintiff was removed from the floor, Defendant Riester began to hit him in the head with several pairs of handcuffs, causing blood to leak from Plaintiff's ear. (Am. Compl. ¶ 39.) Defendant Sisilli then pulled Plaintiff completely to his feet, slammed him into a wall and dragged him onto an awaiting bus, punching him in the midsection the entire time. (Am. Compl. ¶ 39.); (Pl's Dep. 61:11-14.)

The parties also have different versions of what occurred when the bus arrived at Eastern. Plaintiff alleges that once the bus arrived at Eastern, Defendants Sisilli and Riester "hit, slapped, and punched [P]laintiff all the way down to the SHU." (Am. Compl. ¶ 40.); (Pl.'s Dep. 61:11-13.) Defendants, on the other hand, declare that they accompanied Eastern sergeants and officers on Plaintiff's escort to the SHU and that during that escort Defendant Sisilli "maintained control of the plaintiff by holding the plaintiff's waist chain." (Sisilli Decl. ¶ 9; Riester Decl. ¶ 16.) Defendants declare that when they arrived at the SHU, Defendant Sisilli removed Plaintiff's transportation hardware and directed Plaintiff to put his hands in his pockets. Plaintiff did not respond. (Sisilli Decl. ¶ 10; Riester Decl. ¶¶ 17-18.) Thereafter, Eastern staff placed Plaintiff in his cell. (Riester Decl. ¶ 19.)

Plaintiff alleges that he requested medical treatment upon arriving at Eastern, which was

26

denied. (Am. Compl. ¶ 40); (Pl.'s Dep. 60:8-12.)  Plaintiff was seen and treated three times the

following day, June 28, 2005. (Am. Compl. ¶ 40; Gusman Decl. ¶¶ 12-14.)  The first time was at

9:10 a.m.  Plaintiff complained that his left ribs were broken and that there was something

"leaking and moving" in his head[14] as a result of being hit in the head with handcuffs. (Defs.' Ex.

B at 78.)  The nurse who examined him noted that Plaintiff had three-inch reddened areas on

both shoulders with no break of skin and half-inch abrasions on both achilles tendons.  No other

abrasions, contusions, or lacerations were noted.  (Gusman Decl. ¶ 12; Defs.' Ex. B at 78.)  Force

photos were taken during that visit, which indicated bruises on Plaintiff's shoulders from the

altercation. (Pl's Dep. 59:17-24.)  Plaintiff saw a doctor later that day, who ordered x-rays of

Plaintiff's left rib cage and audiology testing in response to Plaintiff's complaints of pain, despite

a normal chest examination and no crepitation of the ribs.  (Gusman Decl. ¶ 13.)  Plaintiff's

medical records show that the x-rays "were read as normal."  (Defs.' Ex. B at 84.)  Plaintiff was

seen again during 7:00 p.m. sick call.  Staff did not note that Plaintiff had any complaints,

although he inquired about a possible scheduling conflict with an upcoming orthopedic

consultation.  (Gusman Decl. ¶ 14.)

      I construe Plaintiff's complaint to allege the following: (1) an excessive force claim

against Defendants Sisilli and Riester; and (2) a denial of medical care claim against Defendants

Sisilli and Riester.

_____

      [14]      Plaintiff's issues with his ears predated the June 28 incident.  On May 10, May 26,
and June 12, he complained of right ear pain, deafness, and discharge.  (Defs.' Ex. B. at 53, 65,
67, 68.)  Plaintiff requested audiology testing on June 15.  (Defs.' Ex. B. at 79.)

1.      Excessive Force

a.      *Merits*

Plaintiff claims that Defendants Sisilli and Riester violated his Eighth Amendment rights by subjecting him to excessive force. (Am. Compl. ¶ 71.)  Defendants argue that they are entitled to summary judgment because Plaintiff did not suffer any severe injuries and the alleged incidents lasted only "a couple of seconds." (Defs.' Br. at 21-22.)  Defendants' arguments are without merit.

Plaintiff's medical examination revealed two three-inch reddened areas on his shoulders with broken skin and a half-inch superficial abrasion on his Achilles tendon.  (Kerwin Ex. E.)  Defendants argue that they are entitled to summary judgment because Plaintiff did not suffer any severe injuries.  (Defs.' Br. at 21-22.)  Defendants' characterization of Plaintiff's injuries as *de minimis* is correct.  Generally, courts in this Circuit have not viewed bruises and other superficial injuries as "serious" injuries. *See Gabai v. Jacoby,* 800 F. Supp. 1149, 1155 (S.D.N.Y. 1992) (holding that a bruise resulting from being pushed into a chair was not a "serious injury"); *DeArmas,* 1993 U.S. Dist. LEXIS 1292, 1993 WL 37501, at *4 (holding that force that resulted in a bruise and an injured right knee was "*de minimis* in the legal sense of the term"); *Shabazz v. Pico,* 994 F. Supp. 460, 471 (S.D.N.Y. 1998) (kicking the ankles and feet of an inmate causing abrasions and minor lacerations are de minimis and insufficient to rise to the level of a constitutional violation).

However, as discussed above in Section I(B)(1) of this Report-Recommendation, the extent of injury suffered by the inmate is only "one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced

such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing

willingness that it occur." *Hudson*, 503 U.S. at 7 (citation and quotation marks omitted).

> In determining whether the use of force was wanton or unnecessary, it may also be proper to evaluate the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response.  The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted).

Here, the parties' different versions of the events of June 27, 2005, make it impossible to

decide these factors as a matter of law.  Where "[t]he circumstances of the incident and

assessment of fault [bear] directly on the issue of whether force used was excessive ... given the

conflicting evidence ... [t]he resolution of that issue must be left to the ultimate trier of fact."

*Corselli v. Coughlin*, 842 F.2d 23, 26-27 (2d Cir. 1988).

Moreover, Defendants' argument that the claims against Defendants Sisilli and Riester

should be dismissed because the incidents lasted only "a couple of seconds" is without merit.

(Defs.' Br. at 21-22.)  While "[t]he Second Circuit has deemed brief confrontations between

prisoners and guards ... insignificant for Eighth Amendment purposes," the cases cited by

Defendants are distinguishable.  Each of the cases involved a single push lasting no more than a

few seconds.  In *Bryan v. Admin. of F.C.I. Otisville*, 897 F. Supp. 134 (S.D.N.Y. 1995), the

prisoner was pushed once by a corrections officer and allegedly "missed steps" causing "pains in

his right leg." *Bryan*, 897 F. Supp. at 135.  In *Malloy v. Defrank*, No. 95-Civ.-9122, 1996 U.S.

Dist. LEXIS 16151, 1996 WL 631725, at *4 (S.D.N.Y. Oct. 31, 1996), an inmate was pushed

once in the back.

Here, Plaintiff alleges that Defendants Sisilli and Riester repeatedly beat him in the draft room, on the way to the bus, and upon arriving at Eastern. (Am. Compl. ¶¶ 37-40.)  Each of these incidents lasted between thirty and sixty seconds. (Pl.'s Dep. 58:16.)  Thus, the assault, when viewed in total, involved numerous punches and kicks and lasted anywhere between a minute and a half and three minutes.  This constitutes a greater amount of force used over a longer period of time than either *Bryan* or *Malloy*.  Therefore, I recommend that the court deny Defendants' motion for summary judgment and allow the claim of excessive force against Defendants Sisilli and Riester to proceed.

b.     *Qualified Immunity*

Defendants argue that they are entitled to qualified immunity. (Defs.' Br. at 23.)

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira*, 380 F.3d at 68-69 (citations omitted); *accord*, *Higazy v. Templeton*, 505 F.3d 161, 169 n.8 (2d Cir. 2007) (citations omitted). Courts may exercise their sound discretion in deciding which of the two prongs should be addressed first, in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 129 S. Ct.

808, 817 (2009).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity';
>
> (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and
>
> (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S. 962 (1992). "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy*, 505 F.3d at 169-70 (citations omitted).  This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants Sisilli and Riester are not entitled to qualified immunity with regard to Plaintiff's excessive force claim.  In *Hudson,* the Supreme Court held that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9.  Thus, viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendants knew or should have known that their conduct violated Plaintiff's Eighth Amendment rights.  Moreover, case law within this circuit has clearly established that a prison official's use of force against an inmate for reasons

31

that do not serve a penological purpose violated the inmate's constitutional rights. *See Boddie,*
105 F.3d at 861-62; *Walsh,* 194 F.3d at 48-50.  Because "qualified immunity would be defeated
if an official 'knew or reasonably should have known that the action he took within his sphere of
official responsibility would violate the constitutional rights of the [plaintiff],'" I recommend that
the court decline to apply the defense of qualified immunity to this claim. *Harlow,* 457 U.S. at
815 (emphasis omitted).

       2.      <u>Denial of Medical Care</u>

Although it is not precisely clear against whom the claim is asserted, Plaintiff alleges that
his Eighth Amendment rights were violated when he was denied immediate medical treatment
after the incident. (Am. Comp. ¶ 40.)  Defendants argue that Plaintiff has failed to state an Eighth
Amendment medical care claim. (Defs.' Br. at 12.)  Defendants are correct.

Here, even liberally construing the complaint and Plaintiff's allegations, Plaintiff has not
raised a triable issue of fact as to the objective element of his Eighth Amendment medical claim.
A "serious medical condition" is "a condition of urgency, one that may produce death,
degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J.
dissenting) (citations omitted), *accord, Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert.
denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Relevant
factors to consider when determining whether an alleged medical condition is sufficiently serious
include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient
would find important and worthy of comment or treatment; (2) the presence of a medical
condition that significantly affects an individual's daily activities; or (3) the existence of chronic

and substantial pain. *Chance*, 143 F.3d at 702-03.  Plaintiff's medical examination  revealed that Plaintiff had two bruises and a superficial laceration on his body. (Kerwin Ex. E.) Plaintiff's superficial injuries are not significant enough to satisfy the objective element.

Even if Plaintiff could raise a triable issue of fact as to the objective element, there is no evidence supporting a finding that any of the Defendants were deliberately indifferent.  Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d, 698, 703 (quoting *Hathaway*, 99 F.3d at 553).  Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference.  *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702-03. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need.  *Farmer*, 511 U.S. at 835.

Here, it is undisputed that Plaintiff saw medical staff three times on the day after the incident. (Kerwin Ex. E.)  Other than the superficial abrasions on Plaintiff's shoulders and achilles tendons, no injuries were noted.  Despite the absence of any indications of serious injury, the doctor ordered x-rays of Plaintiff's ribs.  Those x-rays "were read as normal."  (Defs.' Ex. B at 84.)  Nothing in the record indicates that any Defendant was deliberately indifferent to any medical need.  Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment medical care claim arising from the alleged June 27, 2005, use of force.

**H.      Food Hatch Incident**

At 8:30 a.m. on October 10, 2005, Plaintiff was brought to the health unit from the SHU. (Defs.' Ex. B at 121.)  He stated that his left shoulder had come out of its socket while he was folding a blanket.  *Id*.  Plaintiff was examined and no "deformity" was noted.  *Id*.  Tylenol was prescribed for the pain.  *Id*.

Plaintiff alleges that at lunch time on that same day, he handed his lunch tray and garbage to Defendant T.J.  Brown, at which point Defendant Brown allegedly pulled Plaintiff's left arm until it dislodged from its socket. (Am. Compl. ¶ 41; Pl's Dep. 63:8-21.)  Plaintiff alleges that Defendant T.J. Brown then closed the "feed-up hatch" and said "It's never over."  (Am. Compl. ¶ 41; Pl's Dep. 63:22-24.)  Defendant T. J. Brown declares that Plaintiff's allegation "that on October 10, 2005, I pulled his arm back and forth through the feed up hatch until his shoulder fell out of its socket ... is false."  (Brown Decl., Dkt. No. 75-32 ¶ 9.)

Plaintiff was seen in the medical office of the SHU the next day.  Plaintiff stated that he was "not interested" in any problem with his left shoulder.  (Defs.' Ex. B at 118.)  On physical exam, no note was made of any problems with Plaintiff's left shoulder.  *Id*.

I construe the complaint as asserting the following claims: (1) an excessive force claim against Defendant T.J. Brown; and (2) a retaliation claim against Defendant T.J. Brown.

1.      Excessive Force

Plaintiff alleges that Defendant T.J. Brown violated his Eighth Amendment rights by using excessive force. (Am. Compl. ¶ 72.)  Defendants claim that Plaintiff's excessive force claims are without merit because Plaintiff medical records indicate a prior shoulder injury and no injuries

34

were recorded after the incident with Defendant T.J. Brown. (Defs.' Br. at 17-19.)  Defendants

argue further that Defendant T. J. Brown is entitled to qualified immunity.  (Defs.' Br. at 23.)

    a.    *Merits*

As previously stated, a claim of excessive force presents the question of whether force was

used as a "good faith effort to maintain or restore discipline or maliciously and sadistically for the

very purpose of causing harm" *Hudson,* 503 U.S. at 6 (citation omitted).  In evaluating Eighth

Amendment excessive force claims, "the absence of serious injury is therefore relevant to the

Eighth Amendment inquiry, but does not end it." *Id.* at 7.  The court may additionally assess "the

need for application of force, the relationship between that need and the amount of force used, the

threat 'reasonably perceived by the responsible officials' and 'any efforts made to temper the

severity of a forceful response.'" *Id.* (citation omitted).

Here, Plaintiff and Defendant T.J. Brown present two different versions of the alleged

incident.  Plaintiff alleges that Defendant T.J. Brown, without provocation, pulled his arm so hard

that it became dislodged from its socket.  Defendant, on the other hand, flatly denies that he

touched Plaintiff at all.  This presents a genuine issue of material fact as to whether Defendant T.J.

Brown pulled on Plaintiff's arm in a "good faith effort to restore discipline" or whether that

conduct was malicious.[15]  Because an issue of material fact is present, I recommend that this claim

---

    [15]    Defendants characterize *Holloway v, Mitchell-Oddey*, No. 9:05-CV-0206, 2007 U.S. Dist. LEXIS 74454, 2007 WL 2908923 (N.D.N.Y. Oct. 4, 2007) as holding that Plaintiff's allegations, as a matter of law, do not state an excessive force claim.  (Defs.' Br. at 17-18.)  The case is inapplicable here because it was decided after a bench trial rather than on summary judgment.  Accordingly, Judge Kahn's ruling for the defendants was based on his finding that the plaintiff had not proved *by a preponderance of the evidence* that he was subjected to excessive force.  Here, the standard the Court is required to apply is whether there is a *triable issue of fact*.

survive summary judgment and be presented to a trier of fact.

      b.     *Qualified Immunity*

     Defendants argue that Defendant T.J. Brown is entitled to qualified immunity based on the facts of the case. (Defs.' Br. at 23.)  Based upon clearly established case law and the evidence viewed in the light most favorable to Plaintiff, a reasonable juror could find that Defendant T.J. Brown "knew or should have reasonably known" that forcibly pulling Plaintiff's arms through a food hatch violated Plaintiff's Eighth Amendment rights. For these reasons, I recommend that the Court reject the argument that Defendant T.J. Brown is entitled qualified immunity regarding this claim.

      2.     <u>Retaliation</u>

     Plaintiff claims that Defendant T. J. Brown's actions were retaliatory.  (Am. Compl. at 20-21.)  Defendants have not addressed this claim.  I find that Plaintiff's allegations are sufficiently plausible to withstand *sua sponte* review.  Plaintiff alleges that Defendant T.J. Brown destroyed his personal property on January 27, 2005, and that Plaintiff reported the incident to his area supervisor.  (Am. Compl. ¶¶ 23-25.)  This is a sufficient allegation that Plaintiff was engaged in protected conduct.  Plaintiff alleges that Defendant T.J. Brown then used excessive force on him, stating that "It's never over."  (Am. Compl. ¶ 41.)  This is a sufficient allegation that Defendant T.J. Brown took adverse action that would objectively chill a person from exercising his rights. Finally, although the excessive force incident occurred more than eight months after the destruction of personal property, Defendant T.J. Brown's alleged use of the phrase "It's never over" is sufficient to make a causal connection between the protected conduct and the adverse

action.  Therefore, I recommend that this claim survive *sua sponte* review.

### I.      Recreation Periods

Plaintiff alleges that Defendants Miller, W. Brown, and Healy sent him out for recreation in sub-zero temperature following showers, causing his dreadlocks to freeze and giving him head colds and influenza. (Am. Compl. ¶ 51; Pl.'s Dep. 41:7-12.) Plaintiff claims that he was forced to participate in recreation in "the bitter cold below zero weather, without adequate clothing." (Pl.'s Addendum Mem. at 2; Am. Compl. ¶ 52.)  Plaintiff also alleges that he was denied winter underclothes during these recreational periods. (Am. Compl. ¶ 52.; Pl.'s Dep. 75:6-14.)  When Plaintiff complained about not receiving winter clothes, Defendants Miller, W. Brown, and Healy said that DOCS stopped issuing winter clothing items to inmates and that winter underclothes were not allowed in the SHU during recreation. (Am. Compl. ¶ 52; Pl.'s Dep. 75:16-25.)

 I construe the complaint as asserting the following claims regarding these allegations: (1) an Eighth Amendment conditions of confinement claim against Defendants Miller, W. Brown, and Healy; and (2) a retaliation claim.

### 1.      Conditions of Confinement

Defendants argue that Plaintiff's claims regarding conditions during recreation periods should be dismissed because the recreation period is part of an overall prison regulation that serves a reasonable penological purpose.[16] (Defs.' Br. at 6.)

---

[16] Defendants address Plaintiff's conditions-of-confinement claim regarding his exposure to bitter cold during the recreation period in a section of their brief titled "Miscellaneous Alleged Incidents of Retaliation."  (Defs.' Br. at 5-7.)  They argue that "the SHU rules regarding ... winter underwear and recreation schedule were ... rationally related to important penological concerns, and therefore constitutional in and of themselves."  (Defs.' Br. at 6.) Those rules state that the

A viable Eighth Amendment claim must contain both an objective and a subjective component.  *Farmer*, 511 U.S. at 834.  To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities."  *Id.* (citation and punctuation omitted).  Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim."  *Hudson*, 503 U.S. at 9.

The Second Circuit has held that proof that the inmate was subjected "for a prolonged period to bitter cold" is sufficient to raise a triable issue of fact as to the objective prong.  *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir. 2001) (holding that summary judgment for defendants was precluded where prisoner was subjected to temperatures near or well below freezing in his cell for a five-month period); s*ee also Wright v. McMann,* 387 F.2d 519, 526 (2d Cir. 1967) (vacating a dismissal on the pleadings where the complaint alleged that prisoner was deliberately exposed to bitter cold for periods of twenty-one days or more while in solitary confinement); *Corselli,* 842 F.2d at 27 (holding that summary judgment for defendants was precluded where prisoner was subjected to bitter cold in cell for three months).

----

"[i]nmates confined in the SHU must be permitted one hour of outdoor exercise daily . . . despite weather conditions. If during the exercise period the weather significantly deteriorates, the inmate may request and shall be permitted to return to his/her cell." (Dkt. No. 75-29 at 13.) Under the rule, SHU inmates are not permitted to have winter underclothes, but all SHU inmates are provided with winter outer clothes for use during recreation periods.  (W. Brown Decl., Dkt. No. 75-32 ¶ 7.)  Inmates are also required to shower a minimum of two times per week as part of the SHU's personal hygiene requirement. (Dkt. No. 75-29 at 14.)  Plaintiff does not challenge those rules.  Rather, Plaintiff alleges that the required showers were ill-timed to precede rather than follow recreation, that he was ordered to go outside for recreation in below zero weather, and that he was not provided with appropriate winter clothing.

Where an inmate has not been subjected to "bitter cold" for a "prolonged period," the Second Circuit has held that summary judgment for prison officials is appropriate.  In *Trammell v. Keane,* 338 F.3d 155 (2d Cir. 2003), the plaintiff was deprived of clothing and confined to his cell for a few weeks as a disciplinary measure for his behavior. *Trammell,* 338 F.3d at 159.  The Second Circuit found that summary judgment for the defendants was appropriate because the plaintiff had failed to allege that his cell was open to the elements, lacked adequate heat, or that he had been subjected to "bitter cold." *Trammell,* 338 F.3d at 165.  The Second Circuit stated that it "[had] no doubt that Trammell was made uncomfortable by the deprivation of his clothing, but there [was] simply no factual dispute regarding whether the temperature in his cell posed a threat to his 'health or safety' of the sort that would disallow summary judgment in the defendants' favor." *Id*.

Here, Plaintiff alleges that "on many occasions" he was exposed to "below zero weather" for an hour at a time during recreation period.  (Am. Compl. ¶ 51.)  Although this hour was likely very uncomfortable and was repeated often, the evidence does not show that Plaintiff was ever exposed to bitter cold temperatures for the kinds of "prolonged" periods described in Second Circuit precedent.  Therefore, I recommend that the Court grant Defendants' motion for summary judgment of this claim on the basis that there is no triable issue of fact as to the objective element.

Even if there were sufficient evidence to raise a triable issue of fact as to the objective element, summary judgment of this issue would be appropriate because Plaintiff cannot establish the subjective element. Where a prisoner claims that a defendant provided inadequate conditions of confinement, he must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  A prison official demonstrates deliberate indifference to

inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Here, there is no evidence before the Court that Plaintiff was at an excessive risk. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of Plaintiff's Eighth Amendment conditions of confinement claim regarding recreation periods.

     2.    <u>Retaliation</u>

Plaintiff alleges that Defendants Miller, W. Brown, and Healy committed "retaliatory acts" when they "forced [Plaintiff] to recreation from the shower in below zero weather." (Am. Compl. at 20.)

Plaintiff does not specify for what protected conduct he believes Defendants Miller, W. Brown, and Healy were retaliating. Additionally, Plaintiff makes no claim that he was the only SHU inmate forced to attend recreation periods after his required shower. A policy that is instituted against the general prison population rather than against a certain individual fails to establish the necessary causal connection between Plaintiff's protected conduct and the adverse action taken by Defendants. Thus, the actions on the part of Defendants with regards to recreation periods cannot be considered retaliatory and I recommend that this claim should therefore be dismissed.

### J.      Kosher Meals

Plaintiff claims that Defendant Miller denied him Kosher meals.[17] (Am. Compl. ¶ 50.)

Plaintiff states that he suffered weight loss and head pain because he was forced to eat only bread,

dry cereal, and water.(Am. Compl. ¶ 50.)

Plaintiff alleges that the deprivation of his Kosher meals violated his First Amendment

right to practice religion. (Am. Compl. ¶¶ 50, 72.)  Plaintiff also claims that Defendants K. Lucas,

W. Brown, and Eagen violated his constitutional rights by failing to process his grievances

regarding this issue.  (Am. Compl. ¶¶ 32-33.)

### 1.      Personal Involvement

Plaintiff claims that Defendant Miller personally deprived him of his Kosher meals while

he was at Eastern. (Am. Compl. ¶ 50.)  Defendants claim that Defendant Miller cannot be held

liable in his supervisory capacity because he merely referred Plaintiff's complaints to his Deputy

Superintendent and did not physically serve meals to Plaintiff. (Defs.' Br. at 5.)  Defendants are

correct.

As discussed above in Section I(B)(3), a showing of personal involvement is necessary in

order for § 1983 liability to attach.  A prisoner's allegation that a supervisory official failed to

---

[17]      In a grievance dated March 21, 2005, Plaintiff alleged that Defendant Miller told him that "niggers are not allowed to be Jewish, and if you keep requesting ... this meal, I'm gonna see to it that you will be transferred."  (Pl.'s Ex. I, Dkt. No. 80-4 at 74.)  Plaintiff's amended complaint does not mention this allegation and Plaintiff did not raise it at his deposition.  In his Statement of Disputed Facts filed in opposition to Defendants' motion for summary judgment, Plaintiff states that the issue regarding Kosher meals is "[w]hether the Plaintiff was denied Kosher meals by the defendants."  (Dkt. No. 80 at 2.)  Plaintiff does not appear to be asserting that Defendant Miller personally racially discriminated against him. Therefore, I decline to address this issue.

respond to a grievance is insufficient to establish that the official "failed to remedy the violation after learning of it through a report or appeal" or "allowed the custom or policy to continue after learning of it." *Rivera v. Goord*, 119 F. Supp. 2d 327, 344-45 (S.D.N.Y. 2000); *see also Watson v. McGinnis,* 964 F. Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (quoting *Greenwaldt v. Coughlin*, No. 93 Civ. 6551, 1995 U.S. Dist. LEXIS 5144, 1995 WL 232736, at * 4 (S.D.N.Y. Apr. 19, 1995)).

Here, Plaintiff brings suit against Defendant Miller in his individual capacity, as former Superintendent of Eastern. (Am. Compl. ¶ 8.) Defendant Miller declares that he referred all complaints to the Deputy Superintendent for investigation and action. (Miller Decl, Dkt. No. 75-32 ¶ 9.) This court has previously noted the well-settled principle "that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement ... [t]he same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation." *Booker v. Doe,* No. 9:06-CV-73, 2008 U.S. Dist. LEXIS 76413, 2008 WL 4527601, at *22 (N.D.N.Y. Sept. 30, 2008) (citations omitted). The only connection between Plaintiff's deprivation and Defendant Miller is that Plaintiff filed a grievance complaining that he was not being provided with Kosher meals which Defendant Miller referred to the Deputy Superintendent. Defendant Miller had no direct or tangible connection to Plaintiff's deprivation and his "mere linkage" to the alleged conduct is insufficient to hold him liable in his supervisory capacity. Therefore, I recommend that Plaintiff's

42

claim against Defendant Miller regarding Kosher meals be dismissed.

2.     Grievance Process

Plaintiff alleges that Defendant K. Lucas failed to file a grievance that he attempted to file concerning his free access to religious freedom. (Am. Compl. ¶ 32.) On October 18, 2005, Defendant Superintendent William Brown failed to act on the grievance. (Am. Compl. ¶ 32.) Additionally, Defendant Eagen denied Plaintiff's appeal on November 15, 2005.  (Am. Compl. ¶ 32.)  Plaintiff claims that these actions deprived him of the right to fully exhaust his administrative remedies through the Prisoner's Litigation Reform Act (PLRA). (Am. Compl. ¶ 33.)

I construe Plaintiff's complaint to allege that Defendants K. Lucas, William Brown, and Eagen violated his constitutional rights by failing to properly process his grievance.  Defendants have not addressed this claim.  However, I find that it is subject to *sua sponte* dismissal.

> The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB*, 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983).  However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable § 1983 claim. *Cancel v. Goord*, No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001).  If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991).  "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel*, 2001 WL 303713, at *3; *see also Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca*, 3 F. Supp. 2d 385, 390 (W.D.N.Y. 1998).

43

*Shell,* 365 F. Supp. 2d at 369-370.  Thus, because Plaintiff had no right to file a grievance, the failure to process a single grievance does not rise to the level of a cognizable claim under §1983 and I recommend that the claim therefore be dismissed.

> **K.      November 15 Incident**

Plaintiff alleges that on November 15, 2005, he requested an emergency sick call, complaining of chest pains and dizziness. (Am. Compl. ¶ 42.) Four prison guards, including Defendants Sergeant Dawn DiCairano and Occhipinti, appeared at Plaintiff's cell and ordered him to place his hands into the hatch to be restrained. (Am. Compl. ¶ 42.)  Plaintiff claims that he complied with this request. (Am. Compl. ¶ 42; Pl.'s Dep. 105:13-15.)

Plaintiff alleges that after his hands were in the hatch, Defendant Occhipinti slammed the handcuffs on Plaintiff's's wrists, which pinched his skin and caused him great pain. (Am. Compl. ¶ 43; Pl's Dep. 64:14-17.)  Defendants Occhipinti and DiCairano each declare that after the restraints were placed on Plaintiff, he "yelled and forcibly pulled on the handcuffs, pulling Officer Occhipinti against the cell door causing [Defendant Occhipinti] to hit his right wrist." (DiCairano Decl. at 2); *see also* (Occhipinti Decl. at 2.)  Plaintiff admits that after the handcuffs were placed on his wrist that he "jumped . . . and I just pulled my arm through and started, like, what the hell." (Pl.'s Dep. 64:15-18.)

Plaintiff alleges that  Defendant Occhipinti then pulled Plaintiff's's arm through the hatch causing his face to slam into the steel door and breaking his tooth into two pieces. (Am. Compl. ¶ 44; Pl's Dep. 64:17-20.)  During this time, Plaintiff's's right bicep was also grated across the hatch plate causing multiple abrasions. (Am. Compl. ¶ 45; Pl's Dep. 64:17.) Defendant Occhipinti declares that he pulled back on Plaintiff's forearms so that officers could finish applying the

restraints to Plaintiff. (Occhipinti Decl. at 2.)

Plaintiff alleges that Defendant DiCairano yelled, "[Break] that nigger's arm, I told him we would get him, [break] his arm." (Am. Compl. ¶ 45; Pl's Dep. 66:4-13.)  Defendant DiCairano denies that either she or Defendant Occhipinti used any racial slurs during this encounter. (DiCairano Decl. at 3.) Plaintiff alleges that Defendant Occhipinti continued to assault Plaintiff through the cell door until another guard finally told him to stop. (Am. Compl. ¶ 45.)  Defendants allege that Plaintiff spit at Defendant Occhipinti once he was removed from his cell, an allegation corroborated by several DOCS officers. (Dkt. No. 75-15.)

After this, Plaintiff was taken to the facility emergency room. (Am. Compl. ¶ 46; Dkt. No. 75-6 at 6.) Plaintiff alleges that upon seeing Plaintiff, Defendant Captain Michael Leghorn stated, "[S]tay facing the wall you stupid fucking nigger, if you move I'm going to bust your fucking head open." (Am. Compl. ¶ 46; Pl's Dep. 68:12-16.)  Plaintiff alleges that Defendant Leghorn then began slamming Plaintiff's's head into the wall repeatedly. (Am. Compl. ¶ 46; Pl's Dep. 67:21-24.)  In a memorandum addressed to Defendant Healy on November 23, 2005, Defendant Leghorn admitted to "direct[ing] staff to have [Plaintiff] sit in a chair facing the wall," but denied using any physical force against Plaintiff or making "any racial comments."  (Dkt. No. 75-18 at 11.)  Defendant Leghorn did not file a declaration in support of Defendants' motion for summary judgment.

Plaintiff was eventually examined by a nurse, who found that Plaintiff's only injuries were minor lacerations on his right arm and hand.  Plaintiff was then taken back to his cell. (Am. Compl. ¶ 47; Dkt. No. 75-6 at 6, 11.) Defendant Occhipinti also received medical treatment for

minor abrasions to his right wrist. (Dkt. Nos. 75-15, 75-6 at 6.)  Plaintiff's medical records do not

note any injuries to Plaintiff's head.  At his deposition, Plaintiff testified that Defendant Leghorn's

conduct caused him headaches, but he admitted that he had suffered from headaches prior to the

incident.  (Pl.'s Dep. 68:17-20.)

Defendant DiCairano filed a use of force report stating that Plaintiff's injuries were

minimal and the force used was justified in the attempt to regain control of the situation. (Dkt. No.

75-15.)  The document was confirmed by Defendant W. Brown. (Dkt. No. 75-15.)

I construe the complaint as asserting the following claims: (1) an excessive force claim

against Defendant Occhipinti; (2) a failure to intervene claim against Defendant DiCairano; (3) an

excessive force claim against Defendant Leghorn; and (4) a claim that Defendants Occhipinti,

DiCairano, and Leghorn verbally harassed Plaintiff.

## 1.    Excessive Force: Occhipinti

Plaintiff alleges that Defendant Occhipinti violated his Eighth Amendment rights by

subjecting him to excessive force.  Defendants argue that this claim should be dismissed because

"a virtually identical incident has been found by this court to be insufficient to support an Eighth

Amendment claim" and because Plaintiff "alleges that [D]efendant Occhipinti pulled [his] arm

just once [and this] single action is not sufficiently wanton to support an Eighth Amendment

claim."  (Defs.' Br. at 19.)

As with the alleged excessive force incident involving Defendant T.J. Brown, discussed

above in Section I(H), Defendants cite *Holloway v. Mitchell-Oddey,* 2007 U.S. Dist. LEXIS

74454, 2007 WL 2908923  (N.D.N.Y. Oct. 4, 2007).[18]  Here, Defendants characterize *Holloway* as a "virtually identical" case.  As mentioned above in note 11, Senior District Court Judge Lawrence E. Kahn decided *Holloway* after a bench trial.  The plaintiff testified at trial that when he attempted to push his food tray out the food hatch, one officer grabbed his arm and held it while another officer closed the hatch on the plaintiff's arm and still another officer "began to kick aggressively at the hatch."  *Id.* at * 2.  The plaintiff testified that he suffered injuries to his arm that required ten staples to close.  The defendants testified that the plaintiff initiated the altercation by grabbing one officer's arm and trying to pull it through the hatch into the cell.  *Id.*  Also in evidence was a letter from Prisoner Legal Services that "admit[ted] that Plaintiff may have grabbed [the officer's] arm in the struggle."  *Id.* at * 6.  Judge Kahn  ruled that, based on the evidence presented, the plaintiff had not met his burden of proving *by the preponderance of the evidence* that the force used against him was not a "good faith effort to maintain or restore discipline." *Id.* at *7-8.

 *Holloway* is not applicable here because the standard Judge Kahn applied - the preponderance of the evidence - is a trial standard, not a summary judgment standard.  Here, to survive summary judgment, Plaintiff must simply raise a *triable issue of fact* that Defendants used force in something other than a good faith effort to maintain or restore discipline.  Defendants argue that Plaintiff cannot do so because he "alleges that [D]efendant Occhipinti pulled [his] arm just once."  (Defs.' Br. at 19.)

 Defendants' argument mischaracterizes the evidence.  Plaintiff alleges that Defendant

---

[18]     Defendants served a copy of this unpublished case on Plaintiff with their moving papers.  (Dkt. No. 75-37.)

Occhipinti pulled his arm so hard that his face slammed into the steel door, breaking his tooth, and that Defendant Occhipinti continued to assault Plaintiff until another guard told him to stop.  (Am. Compl. ¶¶ 44-45, Pl.'s Dep. 64:17-20.)  As discussed above in Section I(B)(1), determining whether force is "wanton or unnecessary" or "necessary in a particular situation" involves the weighing of several factors.  Here, a reasonable juror who credited Plaintiff's version of events could find that Defendant Occhipinti used excessive force.  Therefore, I recommend that the Court deny Defendants' motion for summary judgment of this claim.

        2.      <u>Failure to Intervene</u>

Defendants assert that Defendant DiCairano cannot be liable for failure to intervene. (Defs.' Br. at 20.)

As discussed above in Section I(B)(2), an officer cannot be held liable for failure to intervene if there was not a "reasonable opportunity" to stop the alleged use of excessive force. *Cusamano,* 604 F. Supp. 2d at 429 n. 9; *Parker*, 1994 WL 49696 at *8.  This issue can be decided as a matter of law only if "considering all the evidence, a reasonable jury could not possibly conclude" that the officer had a reasonable opportunity to intervene.  *Anderson*, 17 F.3d at 557.

Here, Plaintiff alleges that Defendant Occhipinti continued to assault him until "another prison guard" told him to stop.  (Am. Compl. ¶ 45.)  The allegation that a guard other than Defendant DiCairano had an opportunity to intervene and did, in fact, do so raises a triable issue of fact that Defendant DiCairano could have stopped the assault.  A reasonable juror could conclude that her inaction, coupled with her alleged use of racial epithets and encouragement of the use of force, constituted a failure to intervene.  Therefore, I recommend that the Court deny

Defendants' motion for summary judgment of this claim.

      3.      <u>Excessive Force: Leghorn</u>

Plaintiff alleges that Defendant Leghorn violated his Eighth Amendment rights by subjecting him to excessive force.  As noted above, there is no evidence that Plaintiff was injured as a result of this alleged incident.  Defendants argue that the claim should be dismissed because "courts in this Circuit have dismissed Eighth Amendment claims when a plaintiff's medical records do not support plaintiff's claims of force."  (Defs.' Br. at 20.)  Defendants cite *Davidson v. Murray*, 371 F. Supp. 2d 361 (W.D.N.Y. 2005), *Cunningham v. Rodriguez*, No. 01 Civ. 1123, 2002 U.S. Dist. LEXIS 22660, 2002 WL 31654960 (S.D.N.Y. Nov. 22, 2002)[19], and *Santiago v. Campisi*, 91 F. Supp. 2d 665, 674 (S.D.N.Y. 2000).

In *Davidson*, a prisoner alleged that a guard who was escorting him from his cell to another part of the prison handcuffed him tightly "and twisted and yanked his wrists and arms" and then "placed his body weight onto [the prisoner's] back when he pressed [the prisoner's] face ... into a corner of an elevator."  There was no evidence before the court that the prisoner ever sought medical treatment after the incident.  The court granted the defendant's motion for summary judgment, finding that the prisoner had not raised a triable issue of fact as to either the objective or the subjective prong of his excessive force claim.

In *Cunningham*, a pretrial detainee was forcibly restrained by several court officers after directing a profanity-laden diatribe at a judge.  The EMT who examined the plaintiff after the

_____

[19]    Defendants served a copy of this unpublished case on Plaintiff with their moving papers.  (Dkt. No. 75-37.)

incident found that the plaintiff "had no injuries or complaints."  The plaintiff refused further medical attention.  A week later, the plaintiff complained of neck, shoulder, lower back, and hip pain.  A prison doctor found nothing significant aside from muscle pain.  The doctor advised the plaintiff to return to the clinic if his symptoms continued or worsened, but the plaintiff did not seek further medical treatment.  The court granted the defendants' motion for summary judgment, finding that the plaintiff had not raised a triable issue of material fact.  Specifically, the court found that the plaintiff's injuries were *de minimis*, that the force used was not repugnant to the conscience of mankind because the officers engaged in the "authorized use of force to restore order in the courtroom," and that no reasonable jury could find that the officers acted "wantonly with a sufficiently culpable state of mind."

In *Sanitago*, a pretrial detainee alleged two excessive force incidents by an officer.  In the first, the officer "reached a hand through a prison gate that separated him from plaintiff and brushed underneath plaintiff's eyes to near his nose."  The detainee alleged that, by doing so, the officer "intended to jab both of his eyes."  In the second incident, the officer "sought him out and assaulted him without provocation" by slapping him once on the jaw with an open hand.  The plaintiff did not report any injuries until ten days after the second incident.  Upon examination, no swelling, tenderness, or evidence of any injury was noted.  The defendant moved for summary judgment.  The court found that the detainee had satisfied his burden for the subjective inquiry by maintaining that he "was minding his business when the alleged attacks took place," thus raising a triable issue of fact that any force used was not applied in good faith.  *Id.*  However, the court granted the defendant's motion for summary judgment because any force used was *de minimis* and not repugnant to the conscience of mankind.

50

Defendants argue, essentially, that the Court should grant summary judgment because Plaintiff's testimony is the only evidence in the record that supports a finding that the alleged attack by Defendant Leghorn occurred.  In general, "[c]redibility determinations . . . are jury functions, not those of a judge."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").  There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment.  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005); *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007).  In *Jeffreys*, the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony.  *Jeffreys*, 426 F.3d at 554.  Here, I find that it is appropriate to conclude that no reasonable jury would credit Plaintiff's testimony.  Plaintiff's medical records indicate no damage to his head, even though he was examined shortly after the alleged attack.  Plaintiff's testimony that the only injury he suffered as a result of having his head allegedly repeatedly rammed into a wall was the exacerbation of previously-existing headaches is implausible.  If the mere allegation of the use of force and racial epithets was sufficient, without medical evidence of even a *de minimis* injury, to raise a triable issue of fact, prisoners could fabricate Eighth Amendment claims far too easily.  I therefore recommend that the Court grant Defendants' motion for summary judgment and dismiss the excessive force claim against Defendant Leghorn.

4.      Verbal Threats

Plaintiff claims that while Defendant Occhipinti was pulling Plaintiff's arms through the

feed up hatch, Defendant DiCairano yelled "[break] that nigger's arm, I told him we would get

him back, [break] his arm." (Am. Compl. ¶ 45.)  Defendant DiCairano denies that either she or

Defendant Occhipinti used any racial slurs during this encounter. (DiCairano Decl. at 3.)

"Verbal harassment itself does not rise to the level of a constitutional violation.  Verbal

abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations."

*DeJesus v. Tierney,* No. 9:04-CV-298, 2006 U.S. Dist. LEXIS 22949, 2006 WL 839541, at *33

(N.D.N.Y. Mar. 28, 2006)[20]; *see also Ramirez v. Holmes,* 921 F. Supp. 204, 210 (S.D.N.Y. 1996)

("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim

under 42 U.S.C. § 1983").  Here, Plaintiff's injuries were caused by Defendant Occhipinti, not

Defendant DiCairano.  Because Plaintiff did not suffer any injuries as a result of Defendant

DiCairano verbal abuse, Plaintiff cannot sustain a claim under § 1983 and I recommend that the

claims against Defendant DiCairano be dismissed.

Plaintiff alleges that after he was taken to the prison hospital, Defendant Leghorn stated,

"stay facing the wall you stupid fucking nigger, if you move I'm gonna bust your fucking head

open," and subsequently slammed Plaintiff's head into the wall repeatedly. (Am. Compl. ¶ 46.)

Plaintiff underwent a use of force examination after this incident which did not reveal any injury

to Plaintiff's head. (Dkt. No. 75-19 at 28.)  Absent physical injury, verbal threats and abuse are

insufficient to support a constitutional violation. *See Ramirez,* 921 F. Supp. at 210.  Because no

---

[20]      Defendants served a copy of this unpublished case on Plaintiff with their moving
papers.  (Dkt. No. 75-35.)

actual injuries were recorded and Plaintiff does not allege that any injury resulted from the incident, Defendant Leghorn's alleged behavior does not rise to the level of a cognizable claim under § 1983 and I recommend that the claim therefore be dismissed.

### L.    Shoulder Surgery

Plaintiff was scheduled to have shoulder surgery and broken screw removal on May 25, 2006. (Am. Compl. ¶ 53.) However, on May 13, 2006, Assistant Commissioner Diane Van Buren[21] and W. Brown ordered Defendants Gusman and Doctor Inaganti to cancel Plaintiff's's shoulder surgery so that he could be transferred to the Five Points Correctional Facility.  (Am. Compl. ¶ 54.)  Defendants Gusman and Inaganti cancelled the surgery despite the fact that the surgery had initially been ordered by Mr. Holder on November 16, 1998. (Am. Compl. ¶ 53, 55.); (Pl's Dep. 78:7-9.)  Plaintiff was told that his surgery was cancelled because he "wasn't in [his] right state of mind."(Pl's Dep. 78:12-15.)  As a result of this cancellation, Plaintiff suffered daily excruciating pain and the continual dislocation of his shoulder while sleeping until he later received the surgery at Five Points Correctional Facility. (Am. Compl. ¶ 57; Pl's Dep. 77:9-11.)

Plaintiff claims that Defendants violated his Eighth Amendment rights by cancelling his surgery. (Pl.'s Br. at 5-6.)  Defendants argue that since Plaintiff's surgery was merely postponed and not cancelled, Plaintiff's Eighth Amendment rights were not violated. (Defs.' Br. at 12.) Moreover, Defendants argue that the decision to postpone the surgery based upon Plaintiff's physical and mental state was within the medical judgment of Defendants Gusman and Inaganti and therefore cannot be challenged. (Defs.' Br. at 12.)

---

[21]    Plaintiff originally named Van Buren as a defendant, but later requested that she be dismissed.  The Court granted this request on August 13, 2009.  (Dkt. No. 89.)

An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.  Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id.*  Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.")  However, malpractice that amounts to culpable recklessness constitutes deliberate indifference.  Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance*, 143 F.3d at 703.

In his complaint, Plaintiff asserts that his shoulder surgery scheduled for May 25, 2006 was ordered by Dr. Johnathan Holder in November of 1998. (Am. Compl. ¶ 53.)  Plaintiff claims that this injury constituted a "serious medical need" that required "appropriate, if not immediate, medical attention." (Dkt. No. 80-2 at 5.)  However, Plaintiff himself acknowledges that this surgery was "recommended" and not required. (Dkt. No. 80-2 at 5.)  In *Green,* the court refused to find an Eighth Amendment violation where a prisoner's surgery was cancelled for medical reasons. *Green v. Portuondo,* No. 97 Civ. 2639(AKH), 2000 U.S. Dist. LEXIS 17809, 2000 WL 1808562, at *2 (S.D.N.Y. Dec. 11, 2000).[22]  The *Green* court noted that the plaintiff's medical condition at the time of the cancellation changed the appropriate course of treatment and that it

---

[22]     Defendants served a copy of this unpublished case on Plaintiff with their moving papers.  (Dkt. No. 75-36.)

was in the doctor's discretion to change the course of treatment. *Green,* 2000 U.S. Dist. LEXIS 17809, 2000 WL 1808562, at *4.

Here, Defendants had noticed that Plaintiff was mentally unfit around the time of the surgery and cancelled the surgery because previously a mentally ill inmate had committed suicide after receiving surgery. (Dkt. No. 75-28 at 10.)  "Disagreement as to the appropriate course of treatment [does not] create a constitutional claim." *Green,* 2000 U.S. Dist. LEXIS 17809, 2000 WL 1808562, at *4 (citation omitted).  Plaintiff's claim is nothing more than a dispute over the course of treatment, more specifically a dispute over the timing of Plaintiff's surgery, and therefore is insufficient to state a claim for medical indifference.  Moreover, Defendants claim that the surgery was merely postponed and not cancelled for medical reasons. (Defs.' Br. at 12.) Thus, Defendants did not completely deprive Plaintiff of his recommended treatment, they merely made a decision to reschedule it for a later date that would be most beneficial to Plaintiff's health.

Plaintiff also alleges that Defendant W. Brown ordered the surgery's cancellation and should be held liable in that respect. (Am. Compl. ¶ 56.)  However, in holding that the postponement of the elective surgery itself was not a violation of Plaintiff's Eighth Amendment rights, the court need not address the issue with respect to Defendant W. Brown and I recommend that the claim be dismissed.

### M.    Claims Regarding Treatment of Plaintiff's Vision

While housed at Eastern, from January 24, 2005 until May 23, 2006, Plaintiff claims that he was "treated as an animal," and deprived of adequate medical care. (Am. Compl. ¶ 48.)  More specifically, Plaintiff accuses Defendant Gusman of failing to treat him or allow for treatment by

55

others for the vision impairment suffered by Plaintiff as a result of the constant lighting in the

SHU.[23] (Am. Compl. ¶ 48.)

I construe Plaintiff's complaint to allege a denial of adequate medical care in violation of

the Eighth Amendment.  Defendants argue that Plaintiff has failed to establish that the medical

care provided was improper. (Defs.' Br. at 13.)

Plaintiff alleges that Defendant Gusman "[failed] to treat, and/or refer Plaintiff to an

outside specialist for his vision impairment." (Am. Compl. ¶ 48.)  Defendant Gusman stated that

"Plaintiff's complaints of watery, burning and/or painful eyes were addressed continuously"  by

both himself and members of his staff. (Gusman Aff. at 2.)  The Eastern medical staff noted that

there was no medical problem with Plaintiff's eyes, however he was still given eye drops and pain

medication to address his discomfort. (Gusman Aff. at 2.)  Based upon the examination of

Plaintiff, Defendant Gusman determined that a consultation was not required or justified.

(Gusman Aff. at 2.) "It is well-established that mere disagreement over the proper treatment does

not create a constitutional claim. So long as the treatment given is adequate, the fact that a

prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."

*Morrison v. Mamis,* 2008 U.S. Dist. LEXIS 106416, 2008 WL 5451639, at *7 (S.D.N.Y. Dec. 18,

---

[23]     In addition to this claim against Defendant Gusman, Plaintiff testified at his
deposition that in February 2005 Defendant Farrell took the glasses that Plaintiff was issued for
his medical condition. (Pl's Dep. 71:2-11.)  This allegation does not appear in Plaintiff's
amended complaint.  Defendants have not addressed it.  I find that it is not properly before the
Court and decline to address it.

2008) (citing *Chance,* 143 F.3d at 703)[24]. Thus, Plaintiff's claims of inadequate treatment merely

amount to a difference in opinion between Plaintiff and Defendant Gusman as to how Plaintiff's

eye condition should be treated.  Therefore, I recommend that the court dismiss the claim against

Defendant Gusman.

### N.       Conditions of Confinement

1.       Constant Cell Illumination

While in the SHU, Plaintiff's cell was illuminated twenty-four hours a day. (Am. Compl. ¶

48.)  This constant illumination allegedly caused Plaintiff to "see colorful blurry spots." (Am.

Compl. ¶ 48.)

I construe Plaintiff's complaint to allege cruel and unusual treatment in violation of the

Eighth Amendment.  Defendants argue that the SHU rules regarding lighting are constitutional

and part of an overall prison regulation which serves an important penological concern. (Defs.'

Br. at 6.)

"The Constitution does not mandate comfortable prisons . . . but neither does it permit

inhumane ones." *Harper v. Showers,* 174 F.3d 716, 719 (5th Cir. 1999) (citation omitted).

Therefore, a retaliatory action undertaken by prison officials that is inhumane in nature can violate

the rights of prisoners.  Here, Plaintiff alleges that Defendants forced him to live in a cell where

the lights were on twenty-four hours a day and that this caused him "physical and psychological

harm." (Pl.'s Mem. at 3.)

---

[24]       The Court will provide Plaintiff with a copy of this unpublished decision in
accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Constant illumination of inmate cells can be considered an adverse action in that it "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill*, 389 F.3d at 381(citation omitted).  Courts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights. *See Harper,* 174 F.3d at 720; *Chavarria v. Stacks,* 102 Fed. Appx. 433, 436 (5th Cir. 2004).  While Plaintiff does not specifically allege sleep deprivation, "physical and psychological harm" caused by constant lighting in his cell can be read broadly to encompass such harm.  In addition, Plaintiff claims that he "began to see colorful blurry spots as a result" of this treatment. (Am. Compl. ¶ 48.) This evidence, when coupled with potential sleep deprivation, is sufficient for a reasonable juror to conclude that Plaintiff did suffer some type of actual harm as a result of the lighting conditions in the SHU   Thus, Plaintiff has demonstrated that he had a protected constitutional interest.

However, Plaintiff has failed to demonstrate a causal connection between his conduct and the adverse action of leaving the lights on in the SHU twenty-four hours a day since this policy applied to all inmates in the SHU, not just Plaintiff.  (Def.'s Br. at 6.) Therefore, Plaintiff cannot sustain a claim a retaliation since the adverse action was not directed at him, but rather the entire SHU population.

Moreover, constant illumination is related to a legitimate penological concern. In *Chavarria*, the Fifth Circuit held that constant illumination did not violate an inmate's rights because the practice was "reasonably related to the penological interest of guard security." *Chavarria,* 102 Fed. Appx. at 436. In that case, the guards had informed the prisoners lights were kept on in the administrative segregation area for security purposes and were able to demonstrate that instituting a policy of dimming and brightening the lights when guards passed would be more

58

disruptive to inmate sleep than constant illumination. *Id.* at 437.

At Eastern, inmates are placed in the SHU because the correctional staff has determined "that the inmates' presence in the general population would pose a threat to the safety and security of the facility." (Dkt. No. 75-30 at 2.)  Eastern's SHU inspection guidelines require unit officers to conduct rounds every thirty minutes to ensure prisoner's safety and guard against misconduct. (Dkt. No. 75-30 at 17.)  "A prison regulation impinging on inmates' constitutional rights 'is valid if it is reasonably related to legitimate penological interests'" and deference is to be given to prison administrators in making these rules. *Lewis v. Casey,* 518 U.S. 343, 361 (1996) (citation omitted).  Therefore, Defendants had a legitimate penological interest in protecting both guards and inmates by keeping the lights constantly illuminated in the SHU, a place where some of the most dangerous criminals in the facility were housed.

Plaintiff cites *LeMaire v. Maass,* 745 F. Supp. 623 (D. Or. 1990), to support his claim that constant lighting does not serve a penological interest. However, in *LeMaire,* the inmate had expert psychiatric testimony that twenty-four hour day lighting "makes sleep difficult and exacerbates the harm." *LeMaire,* 745 F. Supp at 636.  Plaintiff has offered no such expert testimony in the present case.  Additionally, the defendants in *LeMaire* failed to cite any legitimate penological justification for their conduct. *Id.* at 636.  Again, Defendants here have a legitimate justification for their actions and that justification has been recognized by other federal courts.

For the above reasons, Plaintiff's claims of retaliatory lighting in the SHU should be dismissed because Plaintiff failed to meet his burden of proof.

2.     Inadequate Ventilation

Plaintiff claims that his cell did not have adequate ventilation causing him breathing

difficulties, sore throats, chest pains and headaches on numerous occasions. (Am. Compl. ¶ 49.);

(Pl's Dep. 72:11-19.)  Again, Plaintiff alleges that these conditions resulted from orders mandated

by Defendants Miller, W. Brown and Healy. (Am. Compl. ¶ 49.) Plaintiff complained to Dr.

Gusman about the ventilation issues and was informed that the current ventilation conditions were

for security purposes. (Pl's Dep. 73:2-6.) Plaintiff also filed grievances complaining about the

ventilation system. (Pl's Dep. 73:12-13.)

I construe this claim to allege cruel and unusual treatment in violation of the Eighth

Amendment.  Defendants argue that the ventilation system is constitutional because it is part of an

overall prison regulation which serves an important penological concern. (Defs.' Br. at 6.)

This court has previously held that:

> [C]omplaints of (1) poorly or non-functional ventilation units, (2) poor
> air quality and breathing conditions, (3) poor cleaning and sanitary
> services to clean the resulting dust which was not properly circulated
> from the cells . . . suffice to constitute a violation as they result in the
> deprivation of a single, identifiable need, air with a quality which is
> breathable and does not result in nose bleeds, headaches, and colds.

*Hamilton v. Smith,* No. 06-CV-805 (GTS/DRH), 2009 U.S. Dist. LEXIS 91032, 2009 WL

3199531, at *16 (N.D.N.Y. Jan. 13, 2009).[25] The caveat, however, is that the plaintiff must be

able to prove that these conditions exist. *Hamilton,* 2009 U.S. Dist. LEXIS 91032, 2009 WL

---

[25]      The Court will provide Plaintiff with a copy of this unpublished decision in
accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

3199531, at *17. Additional inmate corroboration with the alleged complaints constitutes sufficient proof in this district. *Id.*

The DOCS Directive for SHU confinement states that "[e]ach S.H.U. cell ventilation grate shall be thoroughly inspected and cleaned prior to occupancy in order to . . . ensure its good condition." (Dkt. No. 75-30 at 17.) Additionally, the Directive requires that staff members periodically inspect the gate to "ensure that the inmate is keeping the grate clean." (Dkt. No. 75-30 at 17.)  Thus, it appears that DOCS had a policy in place at the time of Plaintiff's confinement to ensure that inmates had adequate ventilation in compliance with their constitutional rights. However, Plaintiff has failed to offer any corroboration that the conditions he describes actually existed, and therefore he does not meet his burden of proof for retaliation.

In addition, Plaintiff has failed to allege that the inadequate ventilation was a retaliatory act against him.  The ventilation policy applied to all inmates in SHU confinement, not just Plaintiff.  Moreover, Plaintiff has not established that Defendants even knew of the alleged ventilation problem because the record does not indicate that he filed any grievances on the matter or complained to staff members.  A defendant cannot commit a retaliatory act if he or she is unaware of the alleged condition that a plaintiff claims constitutes retaliation.  Thus, I recommend that the court grant Defendant's motion for summary judgment on this issue.

### O.    Misbehavior Reports and Disciplinary Hearings

Plaintiff alleges that ten misbehavior reports and the disciplinary hearings that followed violated his constitutional rights.[26]  The ten reports of which he complains are: (1) a February 15

---

[26]      Each report was filed in 2005.

report by Defendant Doctor Mikhail Gusman that resulted in a 30-day SHU sentence imposed by

Defendant Griffin (Am. Compl. ¶59); (2) a March 1 report by Defendant Griffin that resulted in

six months of lost good time credits imposed by Defendant Healy (Am. Compl. ¶ 60); (3) a March

2 report filed by Officer Hetcher[27] that resulted in four months of lost good time credits imposed

by Defendant Healy (Am. Compl. ¶ 61); (4) a June 10 report by Officer Donnelly[28] that resulted in

a 120-day SHU sentence imposed by Defendant Griffin (Am. Compl. ¶ 62); (5) a report filed by

Defendants Sisilli and Riester after the bus incident on June 27 that resulted in a 150-day SHU

sentence and six months of lost good time credits imposed by Defendant Griffin (Am. Compl. ¶

63; Dkt. No. 75-11 at 1); (6) an October 11 report by Officer Tuero[29] that resulted in a 120-day

SHU sentence and six months of lost good time credits imposed by Defendant Healy (Am.

Compl. ¶ 64; Dkt. No. 75-12 at 1); (7) an October 12 report by Officer Tuero that resulted in a 90-

day SHU sentence and six months of lost good time credits imposed by Defendant Healy (Am.

Compl. ¶ 65; Dkt. no. 75-13 at 1); (8) an October 15 report by Defendant Occhipinti that Plaintiff

alleges resulted in a 60-day SHU sentence imposed by Defendant Healy[30] (Am. Compl. ¶ 66; Dkt.

No. 75-14 at 1); (9) an October 16 report by Officer Delgado[31] that resulted in a 60-day SHU

sentence and three months of lost good time credits imposed by Defendant Healy (Am. Comp. ¶

---

[27]    Plaintiff did not name Officer Hetcher as a defendant in this action.

[28]    Plaintiff did not name Officer Donnelly as a defendant in this action.

[29]    Plaintiff did not name Officer Tuero as a defendant in this action.

[30]    As discussed below, the evidence before the Court indicates that no disciplinary
hearing was conducted regarding this misbehavior report.

[31]    Plaintiff did not name Officer Delgado as a defendant in this action.

67); and (10) a November 15 report filed by Defendants DiCairano and Occhipinti after the emergency sick call incident that resulted in a 90-day SHU sentence imposed by Defendant Healy (Am. Compl, ¶ 68).  He further alleges that Defendant Selsky violated his constitutional rights by affirming these ten disciplinary convictions. (Am. Compl. ¶¶ 58-68.)  Plaintiff claims that, as a result of these reports, he was unconstitutionally held in the SHU and suffered physical, mental and spiritual pain.  (Am. Compl. ¶ 58.)

     1.     <u>October 15 Report by Defendant Occhipinti</u>

Before discussing the merits of Plaintiff's claims regarding the misbehavior reports and disciplinary hearings, I must resolve a factual issue regarding the October 15 report by Defendant Occhipinti.

Plaintiff alleges in his amended complaint and testified at his deposition that on October 15, 2005, Defendant Occhipinti filed a misbehavior report against Plaintiff charging him with violating a direct order and interference. (Am. Compl. ¶ 66; Pl's Dep. 98:16-99:4.)  Plaintiff alleges in his amended complaint that Defendant Healy conducted a hearing on this misbehavior report on October 28, 2005. (Am. Compl. ¶ 66; Pl's Dep. 99:6-9.)

Defendants assert that no hearing was held on October 28, 2005. (Defs.' Br. at 8.) Defendant Healy declares that he is "not aware of presiding at a disciplinary hearing involving plaintiff on October 28, 2005" and believes that the date in Plaintiff's amended complaint was an error. (Healy Decl. at 3.)  There is no mention of an October 28 hearing anywhere in Plaintiff's inmate disciplinary hearing record. (Dkt. No. 75-17 at 11.) There is only one oblique reference to even the possibility of a hearing on the October 15 report:  Plaintiff requested that Lester

Robinson testify on his behalf in connection with several misbehavior reports filed in October, including the October 15 report.  Robinson signed a form refusing to testify.  (Dkt. No. 80-5 at 95, 97, 101.)  This is not evidence that a hearing occurred.  Rather, it shows only that the inmate refused to testify if a hearing resulted.

Based upon the evidence before the court, it appears that a misbehavior report was filed, but that no disciplinary hearing was held regarding the incident.  Therefore, I recommend that any claim against Defendant Healy based on the alleged October 28 hearing be dismissed.  I will address Plaintiff's retaliation claim against Defendant Occhipinti regarding this report below.

    2.    *Heck v. Humphrey*

Although Defendants have not addressed this issue, it appears that several of Plaintiff's claim regarding misbehavior reports and disciplinary hearings are barred by the rule in *Heck v. Humphrey,* 512 U.S. 477 (1994).  I will address this issue *sua sponte*.

    a.    *March 1 and 2  Misbehavior Reports*

The sole sanction that Defendant Healy imposed on Plaintiff as a result of the March 1 and 2 reports was a loss of good time credits.  (Dkt. Nos. 75-8 and 75-9.)  Although Defendants have not addressed this issue, I find that Plaintiff's claims regarding these misbehavior reports and the hearings that followed them are barred by the rule in *Heck v. Humphrey*.

In *Heck*, the Supreme Court held that "in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared

invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of *habeas corpus*." *Heck*, 512 U.S. at 486-87.

In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court extended the *Heck* rule to prisoners' challenges to prison disciplinary proceedings that resulted in a loss of good time credits. The Court held that a prisoner seeking damages and declaratory relief regarding procedures used in a disciplinary hearing that resulted in a loss of good time credit is required to show that the disciplinary sentence has been reversed, declared invalid, or called into question by a federal court.

Here, Plaintiff challenges the March 1 and 2 misbehavior reports and the disciplinary hearings that followed them. Those hearings resulted solely in a loss of good time credits. Plaintiff has not shown that these disciplinary sentences have been reversed, declared invalid, or called into question by a federal court. Therefore, Plaintiff's claims regarding the March 1 and 2 misbehavior reports and the hearings that followed are barred by *Heck*. I will therefore not address them further.

     b.     *June 27, October 11, October 12, and October 16  Misbehavior Reports*

As a result of the misbehavior reports filed on June 27, October 11, October 12, and October 16, Plaintiff received a "mix" of punishments, in each instance receiving a SHU sentence and a loss of good time credits.   In mixed-sanction cases such as these, "a prisoner can, without demonstrating that the challenged disciplinary proceedings or resulting punishments have been invalidated, proceed separately with a § 1983 action aimed at the sanctions or procedures that affected the conditions of his confinement ... if he agrees to abandon forever any and all claims he

has with respect to the sanctions that affected the length of his imprisonment." *Peralta v. Vasquez*, 467 F.3d 98, 100 (2d Cir. 2006).  In other words, where a prisoner has received a mix of punishments, he may challenge them in federal court if he agrees to drop any claim regarding the loss of good time credits.

Here, Plaintiff has not shown that these disciplinary sentences have been reversed, declared invalid, or called into question by a federal court.  Nor has Plaintiff agreed to drop any claim regarding the loss of good time credits that he incurred as a result of these misbehavior reports and disciplinary hearings.  Therefore, he may not challenge these disciplinary sentences in federal court and I recommend that the Court *sua sponte* dismiss the claims. I will address Plaintiff's claims regarding these misbehavior reports on the merits, as well, in the event that Plaintiff agrees to drop his claims regarding good time credits or the Court does not adopt my recommendation to dismiss the claims *sua sponte* under *Heck*.

   3.   Claims That Defendants Filed False Misbehavior Reports to Retaliate Against Plaintiff

Plaintiff claims that Defendants Gusman, Sisilli, Riester, Occhipinti, and DiCairano filed false misbehavior reports against him.[32]  A "prison inmate has no general constitutional right to be

---

[32]      Plaintiff also claims that Defendant Griffin's March 1 misbehavior report was false.  (Am. Compl. ¶ 58.)  In the March 1 report, Defendant Griffin charged Plaintiff with two counts of making threats, one count of violating a direct order, one count of creating a disturbance, and two counts of harassment. (Am. Compl. ¶ 60; Pl's Dep. 83:7-17.)  He did so after Plaintiff had to be removed from the hearing room because he called Griffin a "coward ass bitch" and threatened to "stab him with a knife." (Dkt. No. 75-8 at 4.)  This incident was corroborated by Corrections Officer Koehler.  (Dkt. No. 75-8 at 2.)  Defendants have not addressed Plaintiff's claim that the report was retaliatory.  As discussed above, this claim is barred by *Heck* because the sole punishment Plaintiff received as a result of the report was six months of lost good time credits.  Even if this claim were not barred by *Heck*, I would find it

free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)).  The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is where the false accusation is based on something more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.  I will therefore address each misbehavior report separately to determine whether Plaintiff has raised a triable issue of fact that the report was issued in retaliation.  The standard applicable to claims of retaliation is set forth in detail above in Section I(D)(3).

   a.    *Gusman (February 15 report)*

   Plaintiff claims that Defendant Gusman filed the February 15  misbehavior report to retaliate against Plaintiff for filing grievances against him. (Am. Compl. ¶¶ 59, 62-63; Dkt. No. 75-7 at 2.)  Defendants have not addressed this claim.  I will address the claim *sua sponte*.

   Plaintiff engaged in protected conduct by filing a grievance against Defendant Gusman. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996).  However, there is no causal connection between Plaintiff's protected conduct and Defendant Gusman's misbehavior report because Plaintiff did not file the grievance against Defendant Gusman until June 15, 2006.  This was well

---

subject to *sua sponte* dismissal.  Plaintiff does not allege any protected conduct for which Defendant Griffin could have plausibly retaliated.  The only incident involving both Plaintiff and Defendant Griffin in proximity to the filing of the misbehavior report is the March 1, 2005 hearing.  At this hearing, Plaintiff allegedly threatened and harassed Defendant Griffin.  These actions do not qualify as protected speech or conduct, because Plaintiff has no constitutionally protected right to threaten a staff member with physical violence. *R.A.V. v. St. Paul,* 505 U.S. 377, 388 (1992) ("threats of violence are outside the First Amendment").  Therefore, Plaintiff cannot satisfy the first element of a retaliation claim.

*after* Gusman issued the February 15 misbehavior report. (Dkt. No. 75-28.)  Thus, I recommend

that the retaliation claim against Defendant Gusman be dismissed.

      b.    *Sisilli and Riester* (June 27 report)

Defendants Sisilli and Riester filed a misbehavior report against Plaintiff after the June 27

bus incident.  Plaintiff claims that Defendants Sisilli and Riester filed the report in retaliation for

Plaintiff's history of filing grievances. (Pl.'s Dep. 88-89.)  Read broadly, the complaint could also

be construed as asserting a claim that Defendants Sisilli and Riester field the misbehavior report

to cover up their alleged use of excessive force.  Defendants have not addressed either claim.  As

discussed above, I find that Plaintiff's claims regarding the June 27 misbehavior report and the

disciplinary hearing that followed are barred by *Heck*.  However, I will review the retaliation

claims *sua sponte* in the event that the Court does not adopt my recommendation regarding *Heck*.

      i.    Retaliation for Previous Grievances

Plaintiff alleges that Defendants Sisilli and Riester filed the misbehavior report to retaliate

against him for his previous filing of grievances.  I find that, even if not barred by *Heck*, this claim

is not sufficiently well pleaded to survive *sua sponte* review.

  Plaintiff has sufficiently alleged that he engaged in protected speech or conduct.  Filing a

grievance is constitutionally protected conduct.  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.

2002). Thus, Plaintiff's actions of filing grievances were constitutionally protected and satisfies

the first prong of the retaliation claim.

Plaintiff has also sufficiently pleaded that Defendants Sisilli and Riester took adverse

action against him.  "[I]n the prison context we have previously defined adverse action

objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill*, 389 F.3d at 381 (internal quotations and citation omitted.) The Second Circuit, in *Gill*, found adverse action where defendants filed a false misbehavior report and plaintiff was imposed a sentence as a result of that report. *Id.* The situation here is analogous in that Defendants did file a misbehavior report and Plaintiff received SHU confinement as a result. Thus, this misbehavior report passes the second prong of the retaliation inquiry and constitutes adverse action because it is the type of action "that would deter a person of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts." *Id.*

However, Plaintiff cannot establish any causal connection between his protected conduct and the adverse action by Defendants Sisilli and Riester. Neither Defendant Sisilli or Riester was named in any of Plaintiff's previous grievances. Plaintiff claims that Defendants Sisilli and Riester knew of the urine throwing incident with Defendant Jewett because "everybody talks about everybody's business." (Pl.'s Dep. 88-89.) Plaintiff additionally claims that these Defendants knew about his previous complaints at Eastern because they were not going to tolerate Plaintiff "running [his] mouth." (Pl.'s Dep. 89:1-21.) These are purely conclusory statements and cannot serve as a "causal connection" between the misbehavior report and Plaintiff's conduct. The Second Circuit has refused to find a misbehavior report retaliatory where the defendant was not named in plaintiff's original grievance and the misbehavior report was filed approximately ten weeks after the grievance was filed. *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009). Here, the urine incident grievance involved neither Defendants Sisilli nor Riester and their misbehavior report was filed nearly twenty-one weeks after the grievance. Therefore, I recommend that the

Court *sua sponte* dismiss the claim that this misbehavior report was filed in retaliation for Plaintiff's previous grievances, both on the merits and because it is barred by *Heck*.

        ii.     Cover-Up

The complaint can also be construed as alleging that Defendants Sisilli and Riester filed the misbehavior report to cover up their use of excessive force.  A claim of retaliation under § 1983 can be supported by a showing that corrections officers filed a false misbehavior report to "cover up" an assault. *See Snyder v. McGinnis*, No. 03-CV-0909, 2004 U.S. Dist. LEXIS 17976, 2004 WL 1949472, at *8 (W.D.N.Y. Aug. 31, 2004). This case presents conflicting testimony as to whether Defendants Sisilli and Riester actually assaulted Plaintiff.  Such conflicting testimony could give rise to a potential "cover up" on behalf of Defendants Sisilli and Riester that requires further review.  Because Plaintiff has successfully linked this misbehavior report to the alleged assault occurring that day, I find that, if the Court finds it is not barred by *Heck*, this claim should survive *sua sponte* review and not be dismissed.

        c.     *Occhipinti* (October 15 report)

Plaintiff claims that Defendant Occhipinti filed the October 15 misbehavior report to retaliate against him.  The record does not reveal any incident between Defendant Occhipinti and Plaintiff in the days before the report was filed.  At his deposition, Plaintiff was unable to recall the incident, but merely stated that there was always a problem between Defendant Occhipinti and himself. (Pl.'s Dep. 99:1-15.)  This is insufficient to raise a triable issue of material fact.  Thus, I recommend that  Plaintiff's claim of retaliation against Defendant Occhipinti for the October 15 misbehavior report be dismissed *sua sponte*.

d.      *Occhipinti and DiCairano* (November 15 report)

Defendants Occhipinti and DiCairano filed a misbehavior report against Plaintiff after the November 15 emergency sick call incident.  Plaintiff claims that Defendants retaliated against him by filing this report.  (Am. Compl. at 19-20.)  Defendants have not addressed this argument. As with Defendants Sisilli and Riester, there is a triable issue of fact that Defendants Occhipinti and DiCairano filed the misbehavior report to "cover up" their own use of excessive force. Therefore, I recommend that Plaintiff's retaliation claim against Defendants Occhipinti and DiCairano survive *sua sponte* review.

4.      <u>Claims That Defendants Griffin and Healy Violated Plaintiff's Right to Procedural Due Process During Disciplinary Hearings</u>

Plaintiff alleges that Defendants Griffin and Healy violated his right to procedural due process by denying him witnesses, proceeding with hearings in his absence, and finding him guilty of disciplinary violations without sufficient evidence.  In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law.  *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000).  Defendants argue that Plaintiff's due process claims should be dismissed because he was not deprived of a liberty interest and, even if he was, he received all the process he was due. (Defs.' Br. at 7-10.)

a.      *Liberty Interest*

As a preliminary matter, Defendants argue that Plaintiff's claims against Defendants Griffin and Healy should be dismissed because he was not deprived of a liberty interest.  (Defs.'

Br. at 9.)

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Sandin v. Conner*, 515 U.S. 472, 483-86 (1995) (alteration in original)).  "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Id*. (quoting *Wright v. Coughlin*, 132 F. 3d 133, 136 (2d Cir. 1998)).

The SHU sentences Plaintiff received as a result of the February 15, October 12, October 16, and November 15 reports (30 days, 90 days, 60 days, and 90 days) fall within the "short range" of disciplinary confinement and thus implicate a liberty interest only if "the conditions were more severe than the normal SHU conditions[33]."  *Palmer*, 364 F.3d at 65.  The sentences Plaintiff received as a result of the June 10, June 27, and October 11 misbehavior reports (120 days, 150 days, 120 days) fall within the  "intermediate duration" of confinement which requires "a detailed record of the conditions of the confinement relative to ordinary prison conditions."  *Palmer*, 364 F.3d at 64-65.  This "detailed record" must contain "information as to the actual conditions in both [SHU] segregation and for the general population."  *Davis v. Barrett*, 576 F.3d 129, 135 (2d Cir. 2009).

---

[33]    "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week.  *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004).

Defendants, citing the Declaration of Defendant W. Brown, argue that "the conditions in Eastern's SHU significantly mirror those imposed on the general population at Eastern." (Defs.' Br. at 10.) In the paragraph of the declaration cited by Defendants, Defendant W. Brown states that:

> Unlike other inmates in the general population at Eastern, SHU inmates are confined to their cells twenty-three hours per day. SHU inmates lose privileges as required by NYSDOCS Directive 4933, in addition to any loss of privileges imposed by a hearing officer as a result of a disciplinary hearing. SHU inmates are permitted to participate in programming in the form of cell study, but are not permitted to leave SHU to attend programs. In all other respects, the conditions of Eastern SHU inmates and those of the general population are the same.

(W. Brown Decl., Dkt. No. 75-32 ¶ 13.) Directive 4933, which is 34 pages long, describes in detail the policies applicable to SHU inmates. (Kerwin Decl. Ex. AA, Dkt. No. 75-33.) SHU inmates are allowed to possess only prescribed personal items: all other personal property is confiscated and stored elsewhere until the inmate is released from the SHU. *Id*. at 9-10. SHU inmates are allowed one nonlegal visit per week. *Id*. at 11. Phone calls are prohibited except for emergency calls and legal calls approved by the superintendent. *Id*. After serving 30 consecutive days free of disciplinary sanctions, SHU inmates are allowed some additional items and privileges. *Id*. SHU inmates' access to law library materials is limited. *Id*. at 14. SHU inmates are not allowed visits from inmate religious advisors and are not allowed to attend congregate religious services. *Id*. SHU inmates are placed in mechanical restraints prior to exiting their cells. *Id*. at 16.

I find that the conditions mandated by Directive 4933 combined with Plaintiff's allegations regarding the treatment he received in the SHU are sufficient to raise a triable issue of fact that Plaintiff was subject to atypical and significant hardship during his SHU sentences. Therefore, I

recommend that the Court reject Defendants' argument that Plaintiff was not deprived of a liberty interest.

  b.   *Process Due*

Due process is satisfied if an inmate facing disciplinary charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).

Plaintiff argues that he was denied due process because (1) Defendants Griffin and Healy refused to call witnesses whom Plaintiff requested; (2) in some instances, Plaintiff was not present at the hearing; and (3) the decisions by Defendants Griffin and Healy were not supported by "some evidence." Defendants argue that Plaintiff's claims against Defendants Griffin and Healy should be dismissed because he received all the process he was due. (Defs.' Br. at 7-10.)

  i.   Hearing on February 15 report

Plaintiff argues that Defendant Griffin deprived him of due process during the hearing on Defendant Gusman's February 15 misbehavior report by denying Plaintiff's requests for witnesses and basing his determination on insufficient evidence. (Am. Compl. ¶ 59.)

In the February 15 report, Defendant Gusman charged Plaintiff with making threats. (Am. Compl. ¶ 59; Dkt. No. 75-6.) Defendant Gusman stated that Plaintiff told him that he "was a member of a gang from Brooklyn and that they would take care of [him]." (Dkt. No. 75-6 at 4.)

74

This alleged threat was confirmed by Sergeant Pagaluighi.[34] (Dkt. No. 75-6 at 4.)

Plaintiff requested that inmates Smith and Banner testify at the hearing on this misbehavior report. (Dkt. No. 75-6.) Inmate Smith refused to testify on Plaintiff's behalf. (Dkt. No. 75-6.) Defendant Griffin did not allow inmate Banner to testify because Banner was not present during the incident and would only offer hearsay testimony. (Dkt. No. 75-6.)

Plaintiff alleges that Defendant Griffin deprived him of due process by refusing Plaintiff's request for inmates Smith and Banner to appear as witnesses. Plaintiff's claim is without merit as a matter of law. An inmate's right to call witnesses is not the same as a defendant's in a criminal trial, but rather is qualified by the circumstances of prison life. *Wolff*, 418 U.S. at 566-67. Hearing officers have no power to force an inmate to testify and an "inmate has no constitutional right of confrontation." *Silva v. Casey,* 992 F.2d 20, 21-22 (2d Cir. 1993). "Although the *Wolff* Court did not explicitly mention 'futility' as a valid basis for refusing to call a witness ... it did refer to 'lack of necessity.'" *Silva,* 992 F.2d at 22. "Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him" and it would be futile to do so. *Id.* Disciplinary hearing officers also have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case. *Wolff*, 418 U.S. at 566-67.

Because Defendant Griffin lacked the power to compel Smith's testimony, Smith's testimony no longer was a "necessity" and his absence did not violate due process under *Wolff.* Additionally, Defendant Griffin's denial of inmate Banner also does not constitute a due process violation. "A hearing officer does not violate due process by excluding irrelevant or unnecessary

---

[34]    Plaintiff did not name Sergeant Pagaluighi as a defendant in this action.

testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir. 1999).  Thus, Defendant Griffin's

exclusion of hearsay testimony from an inmate not present during an incident was proper in that it

excluded irrelevant and inadmissible evidence from the proceeding.

Defendant Griffin relied upon the following evidence in finding Plaintiff guilty: Defendant

Gusman's misbehavior report and personal testimony; the testimony of Nurse Aversano, Officer

Farrell, Sergeant Pagaluighi, and Plaintiff; and the grievance report filed by Plaintiff after the

incident.  All five witnesses, including Plaintiff, testified that Plaintiff told Defendant Gusman that

he was "a member of a gang from Brooklyn."  Defendant Gusman and Nurse Aversano testified

that they heard Plaintiff threaten Defendant Gusman.  Officer Farrell  testified that Plaintiff

"appeared irritated" during the incident.   (Dkt. No. 75-6.)

Due process in this context requires only that the hearing officer's decision not be

"arbitrary." *Wolff*, 418 U.S. at 571.  A decision is not "arbitrary" if it is supported by "some

evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985).  "This standard is extremely tolerant

and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira v.*

*Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (emphasis in original) (quoting *Friedl v. City of New York*,

210 F.3d 79, 85 (2d Cir. 2000)).  Here, Defendant Griffin's decision was based on some evidence.

Therefore, I recommend that Plaintiff's procedural due process claim against Defendant Griffin

regarding the February 15 misbehavior report be dismissed.

ii.    Hearing on June 10 report

Plaintiff alleges that Defendant Griffin deprived him of due process during the hearing on

the June 10 report by denying him witnesses and finding him guilty.  (Am. Compl. ¶ 62.)

In the June 10 report, Officer Donnelly charged Plaintiff with violating a direct order and refusing to follow facility regulations and staff directions regarding movement within the facility. (Dkt. No. 75-9 at 4.)  Officer Donnelly reported that as he was escorting Plaintiff to his cell, Plaintiff abruptly stopped, spun around, and did not resume walking when ordered.  *Id.*

Plaintiff requested that Officers Sipley, Minuck, Bock, Tuero, Bauder, Leucks, Captain Coleman, and Defendant Healy testify at his hearing. (Dkt. No. 75-9.)  All requested witnesses did testify. (Dkt. No. 75-9.)

The hearing records indicate that Defendant Griffin relied upon the following evidence: the misbehavior report written by Officer Donnelly and testimony from Officers Coleman, Leucks, Minuck, Butler, Tuero, Sipley, Sergeant Bock, and Defendant Healy. (Dkt. No. 75-9.)  Each officer testified that they heard Officer Donnelly give a direct order and observed Plaintiff being noncompliant, with the exception of Officer Butler who testified that he did not see anything. (Dkt. No. 75-10.)  This evidence was sufficient to support Defendant Griffin's decision.  Therefore, I recommend that Plaintiff's procedural due process claim against Defendant Griffin regarding the June 10 misbehavior report be dismissed.

iii.     Hearing on June 27 report

Plaintiff alleges that Defendant Griffin violated his right to procedural due process during the hearing on the June 27 misbehavior report by denying his request for witnesses and finding him guilty.  (Am. Compl. ¶ 63.)  As discussed above, I recommend that this claim be dismissed because it is barred by *Heck*.  However, I will discuss the merits of Plaintiff's claim for the sake of completeness.

77

In the June 27 misbehavior report, which Defendants Sisilli and Riester filed after the bus incident, Plaintiff was charged with violent conduct, creating a disturbance, interfering with an employee, two counts of refusing a direct order, and harassment.  (Dkt. No. 75-10 at 1.)

The record indicates that Plaintiff requested as witnesses twenty-one inmates who were present on the bus during the incident. (Dkt. No. 75-10.)  The twenty-one inmates Plaintiff requested as witnesses each refused to testify, citing, among many things, that they did not witness the situation, had no idea the incident occurred, or did not know Plaintiff.  (Dkt. No. 75-10.) Because, as discussed above, Defendant Griffin has no power to compel inmate witnesses to testify at a disciplinary hearing, the inmates' refusal to testify cannot be held against him as a violation of due process. *Silva,* 992 F.2d at 22.

The record indicates that Defendant Griffin relied on the following materials when making his decision: the misbehavior reports filed by Defendants Sisilli and Riester; the testimony of Defendant Sisilli, Defendant Riester, Officer Bauder, and Plaintiff; the refusal to testify forms of the other 21 inmates aboard the bus; and memoranda submitted by officers at Downstate and officers who were present at Eastern when Plaintiff and Defendants arrived. (Dkt. No. 75-10.) Defendants Sisilli and Riester each testified to the fact that Plaintiff refused orders and created a disturbance on the bus. (Dkt. No. 75-10.)  Plaintiff testified that he was not given a direct order and did not threaten or harass the corrections officers. (Dkt. No. 75-10.)  Officer Zorn submitted a memorandum stating that he heard Plaintiff shouting at transportation staff while being prepared for transport. (Dk. No. 75-10.)  Officer Bradley and Captain Coleman each submitted separate memoranda detailing the events that occurred once Plaintiff arrived at Eastern, explicitly stating that no force was used on Plaintiff as he was escorted to the SHU. (Dkt. No. 75-10.)   This

evidence was sufficient to support Defendant Griffin's decision.  Therefore, I recommend that

Plaintiff's procedural due process claim against Defendant Griffin regarding the June 27

misbehavior report be dismissed both because it is barred by *Heck* and because Plaintiff has not

raised a triable issue of fact on the merits.

> iv.     Hearing on October 11 report

Plaintiff alleges that Defendant Healy violated his right to procedural due process during

the hearing on the October 11 misbehavior report by denying his request for witnesses, conducting

the hearing in his absence, and finding him guilty.  (Am. Compl. ¶ 64.)   As discussed above, I

recommend that this claim be dismissed because it is barred by *Heck*.   However, I will discuss the

merits of Plaintiff's claim for the sake of completeness.

In the October 11 report, Officer Tuero charged Plaintiff with violent conduct, refusing a

direct order, and making threats.  (Dkt. No. 75-11.)  Officer Tuero reported that on October 11,

2005, C.O. R. Smith gave Plaintiff a five-minute warning to finish showering.  (Dkt. No. 75-11 at

4.)  Plaintiff responded, " 'I'll finish when I'm ready, Fuck you bitch, Faggot.' " *Id.*

Approximately five minutes later, C.O. Smith and J. Wetherbee instructed Plaintiff to finish

showering to which Plaintiff responded, " 'What are you looking at me for[?] [Y]ou want to see

my dick?  Take me out of the shower.' " *Id.*  Plaintiff then told C.O. Wetherbee, " 'I've been

locked down for 20 [years].  I will fuck a pretty thing like you in the ass.' " *Id.*  After several orders

Plaintiff complied and was escorted to his cell from which he yelled " 'Crack my door, you can

split my head wide open.  I don't give a fuck.  I will kill all you motherfuckers,' " while banging on

his cell door.  *Id.* at 4-5.

Plaintiff requested that inmates Robinson and Corresquillo serve as witnesses at the hearing on the report. (Dkt. No. 75-11.)  The record includes an "Assistant Form" that is signed by Plaintiff and Sgt. R. McGrath, who assisted Plaintiff in connection with the charges.  Dkt. No. 75-12, at 17.  The form indicates that Sgt. McGrath met with Inmates Corresquillo and Robinson before the hearing.  *Id.* at 17.  The form also indicates these inmates agreed to testify as potential witnesses, and when asked whether they heard Plaintiff threaten to kill C.O. Tuero and whether they heard C.O. Smith give Plaintiff a five-minute warning to come out of the shower, they responded "no" to both questions.  *Id.* at 17.

Inmate Corresquillo did testify at Plaintiff's hearing. (Dkt. No. 75-11.)  Inmate Robinson refused to testify.  *Id.* at 2, 6-7.  A form signed by Inmate Robinson indicates that he refused to testify because "[a]ny reports written on any date involving Inmate Tafari [are] none of my business."  *Id.* at 7.  As discussed above, a hearing officer has no power to compel an inmate to testify.  Therefore, Defendant Healy did not violate Plaintiff's due process rights by refusing to compel inmate Robinson's presence.

Plaintiff did not appear at the hearing.  Plaintiff alleges that Defendant Healy accepted "denial to attend the hearing form without personal ascertain (sic)."  (Am. Compl. ¶ 64.)  Extremely liberally construed, the complaint appears to allege that Defendant Healy violated Plaintiff's procedural due process rights by refusing to allow Plaintiff to attend the disciplinary hearing.

New York regulations require an inmate to attend a hearing "unless he or she refuses to attend, or is excluded for reasons of institutional safety or correctional goals." 7 N.Y.C.R.R. §

254.6(a)(2) (2010).  "Under ordinary circumstances, when an inmate voluntarily waives his appearance before a disciplinary hearing officer, he cannot then attack the adjudication as violative of his constitutional rights. An inmate's refusal to attend a disciplinary hearing waives his due process objections... only when it occurs 'through no fault of prison officials.'"  *Howard*, 768 F. Supp. at 1006 (citations omitted)(denying defendants' motion for summary judgment of due process claim where prisoner refused to attend hearing because officers arrived at his cell at an unusual time of night to escort him to the hearing and used strange terminology to refer to the hearing).

Here, Defendant Healy's written disposition form indicates that Plaintiff "refused to attend." (Dkt. No. 75-12 at 3.)  The record indicates that Plaintiff refused to sign the form titled "Inmate Refusal to Attend Hearing" or to provide his reasons for the refusal to attend the hearing. (Dkt. No. 75-12 at 27.)  This refusal was witnessed by two correctional officers. (*Id.*; Healy Decl. at 3.)  There is no evidence in the record that Plaintiff refused to appear "through [the] fault of prison officials."  Therefore, I recommend that the Court dismiss Plaintiff's claim that his absence from the hearing violated his right to due process.

Plaintiff alleges that Defendant Healy wrongfully found him guilty.  Defendant Healy relied on the testimony of Plaintiff's requested witness, inmate Corresquillo, and the testimony of an OMH staff-person "relative to [Plaintiff's] mental state." (Dkt. No. 75-11 at 3.)  Defendants have not provided copies of this testimony.[35]

---

[35]  The record indicates that Plaintiff was not permitted to review the testimony of the OMH staff-person and that the testimony was taken on a separate confidential tape.  Dkt. No. 75-12 at 9.

The record also contains a copy of a log dated October 11, 2005.  Dkt. No. 75-12 at 20.
The log indicates that Plaintiff was given five minutes to come out of the shower, but he refused
and cursed at Officers Smith, Wetherbee, and Tuero.  *Id.*  This evidence was sufficient to support
Defendant Healy's finding.  Therefore, I recommend that Plaintiff's procedural due process claim
against Defendant Healy regarding the October 11 misbehavior report be dismissed both because it
is barred by *Heck* and because Plaintiff has not raised a triable issue of fact on the merits.

      v.       Hearing on October 12 report

Plaintiff alleges that Defendant Healy violated his right to procedural due process during
the hearing on the October 12 misbehavior report by denying his request for witnesses, conducting
the hearing in his absence, and finding him guilty.  (Am. Compl. ¶ 65.)   As discussed above, I
recommend that this claim be dismissed because it is barred by *Heck*.  However, I will discuss the
merits of Plaintiff's claim for the sake of completeness.

On October 12, 2005, Officer Tuero charged Plaintiff with making threats and harassment.
(Dkt. No. 75-12 at 4.)  Officer Tuero reported that on October 12, 2005, Plaintiff was being
interviewed by an Office of Mental Health employee, Psych.Rudder, in the SHU TV room.  (Dkt.
No. 75-12 at 4.)  Plaintiff shouted at Officer Tuero, "'Fuck you, you fat fucking lying bitch" and
stuck up his middle finger.  *Id.*  Plaintiff then grabbed his "penis area" and shouted, " 'Suck my
dick.' " *Id.*  This conduct forced Psych. Rudder to end the interview and Plaintiff was escorted to
his cell, during which time Plaintiff called Officer Tuero "a fat bitch" and called Sgt. Pagaluighi a
"fat fucking faggot'" and then stated, " 'I'll kill you.' " *Id.*  Plaintiff then told Officer Tuero that he
would "kick [her] ass" and "kick [her] husband's [] ass." *Id.*

Plaintiff requested Psych. Rudder as a witness. (Dkt. No. 75-12.)  Plaintiff also requested that inmates Robinson, Corresquillo, and Price serve as witnesses at this hearing. (Dkt. No. 75-12.) Inmates Robinson, Corresquillo, and Price were interviewed prior to the hearing as potential witnesses. (Dkt. No. 75-12.)  In the inmate interviews, each inmate answered the question, "Did you hear or see Tafari harass or threaten C.O. A. Tuero on October 12, 2005?" in the negative. (Dkt. No. 75-12.)

Psych. Rudder testified at the hearing.  (Dkt. No. 75-12.)  Inmate Robinson signed a refusal-to-testify  form, indicating that he refused to testify because "[a]ny reports written on any date involving Inmate Tafari [are] none of my business."  *Id.* at 6.  The record contains two refusal to testify forms stating that inmates Corresquillo and Price refused to testify.   The forms indicate that the inmates refused to sign.  Although a space is provided for the information, the forms do not indicate that a DOCS employee specifically asked the inmates why they were refusing to provide further information.  (Dkt. No. 75-12 at 12-13.) The record suggests that Officers Lapp and Wenzi testified at the hearing regarding the inmates' refusal to testify.  *Id.* at 8.   Because, as discussed above, hearing officers do not have the power to compel witness testimony, I find that Defendant Healy did not violate Plaintiff's due process rights by failing to compel inmates Robinson, Corresquillo, and Price to testify.

Plaintiff did not attend the October 27, 2005, hearing in connection with the incident report filed on October 12. (Dkt. No. 75-12.)  Plaintiff's signature is absent from his refusal to attend the hearing form or any other form that required Plaintiff's signature used in connection with that hearing. (Dkt. No. 75-12 at 2-3, 8, 11-13, 15.)  Defendant Healy declares that Plaintiff not only refused to attend the hearings, but also refused to sign the refusal forms. (Healy Decl. ¶ 3.)

Because there is no evidence in the record that Plaintiff's absence was the fault of prison officials, I recommend dismissing Plaintiff's claim that Defendant Healy violated his due process rights by proceeding with the hearing in his absence.

Defendant Healy stated that he relied on Officer Tuero's written report, the testimony of Psych Rudder, and the testimony of an OMH staff-person "relative to [Plaintiff's] mental state" in finding Plaintiff guilty.  (Dkt. No. 75-12 at 2.)  This evidence was sufficient to support Defendant Healy's decision.  Therefore, I recommend that Plaintiff's procedural due process claim against Defendant Healy regarding the October 12 misbehavior report be dismissed both because it is barred by *Heck* and because Plaintiff has not raised a triable issue of fact on the merits.

> vi.     Hearing on October 16 report

Plaintiff alleges that Defendant Healy violated his right to procedural due process during the hearing on the October 16 misbehavior report by denying his request for witnesses, conducting the hearing in his absence, and finding him guilty.  (Am. Compl. ¶ 67.)   As discussed above, I recommend that this claim be dismissed because it is barred by *Heck*.   However, I will discuss the merits of Plaintiff's claim for the sake of completeness.

In the October 16 report, Officer Delgado charged Plaintiff with harassment and possessing an unauthorized article in an unauthorized area.  (Dkt. No. 75-13 at 4.)  Officer Delgado reported that on October 16, 2005, while "giv[ing] out law library supplies in SHU," she "noticed" Plaintiff smoking.  *Id*.  Plaintiff heard Officer Delgado inform another officer that Plaintiff was smoking. *Id*.  Plaintiff "acknowledged that he was smoking," and said, " 'Yea bitch I'm smoking,' " and then called Delgado " 'a fucking bitch' " and " 'bitch ass faggot.' " *Id.*  Delgado issued Plaintiff his

84

legal materials and proceeded with her rounds.  *Id.*

Plaintiff requested only one witness, inmate Robinson, to testify at his hearing. (Dkt. No. 75-14.)   Inmate Robinson refused to testify on Plaintiff's behalf and signed the refusal form. (Dkt. No. 75-14.)  Thus, there is no constitutional violation because  Defendant Healy had no duty to compel his testimony.  *Silva,* 992 F.2d at 21-22.

Plaintiff alleges that Defendant Healy accepted Plaintiff's denial to attend the hearing form without verifying the refusal with Plaintiff. (Am. Compl. ¶ 67.)  It is uncontested that Plaintiff did not attend the October 26, 2005, hearing in connection with the incident report filed on October 12. (Dkt. No. 75-14; Pl.'s Dep. 101:9-13.)   Plaintiff did not sign any of the forms required for refusal or any other document resulting from that hearing. (Dkt. No. 75-14 at 2-3, 6-7, 9.)  Defendant Healy stated that Plaintiff refused to attend the hearing and his refusal was witnessed by two corrections officers. (Healy Decl. ¶ 3.)  Because there is no evidence in the record that Plaintiff's absence was the fault of prison officials, I recommend dismissing Plaintiff's claim that Defendant Healy violated his due process rights by proceeding with the hearing in his absence.

Defendant Healy relied on Officer Delgado's written report and the testimony of an OMH staff-person "relative to [Plaintiff's] mental state" to find Plaintiff guilty of the disciplinary charges.  (Dkt. No. 75-13 at 2.)  This evidence was sufficient to support Defendant Healy's decision.  Therefore, I recommend that Plaintiff's procedural due process claim against Defendant Healy regarding the October 16 misbehavior report be dismissed both because it is barred by *Heck* and because Plaintiff has not raised a triable issue of fact on the merits.

vii.    Hearing on November 15 report

85

Plaintiff alleges that Defendant Healy violated his right to procedural due process during the hearing on the November 15 misbehavior report by denying his request for witnesses and finding him guilty.  (Am. Compl. ¶ 68.)

In a misbehavior report filed after the November 15 sick call incident, Defendant DiCairano charged Plaintiff with violent conduct, assault on staff, committing an unhygienic act, interfering with an employee, and refusing a direct order.  (Dkt. No. 75-14 at 1.)

The record indicates that Plaintiff requested that ten inmates be interviewed as potential witnesses. (Dkt. No. 75-14.)  All of the inmates were interviewed and, of those ten inmates, five agreed to testify on Plaintiff's behalf. (Dkt. No. 75-14.)  There is no violation of due process for those inmates who refused to testify in Plaintiff's hearing because Defendant Healy has no power to compel their testimony. *Silva,* 992 F.2d at 22.  With regard to the inmates who agreed to  testify, the hearing record does not state why they were not permitted to testify. (Dkt. No. 75-14.) Defendant Healy's declaration does not explain why the witnesses did not testify.  In fact, the only statement in Defendant Healy's declaration about this hearing is that "I ... served as the hearing officer at plaintiff's December 5, 2005, disciplinary hearing."  (Healy Decl. ¶ 6.)  This is in contrast to Defendant Healy's declaration regarding the other hearings, in which he described who did and did not testify and why.  (Healy Decl. ¶¶ 4-5, 7-8.)  "Due process requires that the hearing officer explain why any witnesses requested were not allowed to testify." *Tapp v. Tougas,* 2008 U.S. Dist. LEXIS 82973, 2008 WL 4371766, at *38-39 (N.D.N.Y. Aug. 11, 2008) (citing *Ponte v. Real,* 471 U.S. 491, 497 (1985)).[36]  Without a showing that Defendant Healy had a "rational basis" for

---

[36]     Defendants served a copy of this unpublished case on Plaintiff with their moving papers.  (Dkt. No. 75-35.)

excluding the testimony as "irrelevant or unnecessary," a violation of Plaintiff's due process rights

is implicated. *Kalwasinski,* 201 F.3d at 109.   Therefore, I recommend that Plaintiff's claim that

Defendant Healy violated his due process rights at the hearing on the November 15 misbehavior

report survive summary judgment.

     5.     <u>Claims That Defendants Griffin and Healy Retaliated Against Plaintiff</u>

     Plaintiff alleges that Defendants Griffin and Healy, by denying him due process during

disciplinary hearings, committed "retaliatory acts."  (Am. Compl. at 19-20.)  Defendants have not

addressed this claim.

     The complaint does not contain any facts suggesting why Plaintiff believes that Defendants

Griffin and Healy retaliated against him.  Other than the conclusory allegation buried within one

paragraph at the end of the amended complaint that these Defendants acted in retaliation, the

record is devoid of any details about this claim.  (Am. Compl. at 19-20.)  These retaliation claims

are classic examples of the concerns that the Second Circuit expressed in *Flaherty* and *Dawes*

(discussed above in Section I(D)(3)) regarding the ease with which retaliation claims can be

fabricated.  I find nothing in the record to support Plaintiff's claims.  Therefore, I recommend that

the Court *sua sponte* dismiss Plaintiff's retaliation claims against Defendants Griffin and Healy.

     6.     <u>Defendant Selsky</u>

     Plaintiff alleges that Defendant Selsky violated his constitutional rights by affirming the

results of his disciplinary hearings. (Am. Compl. ¶ 58.)  The affirming of a disciplinary conviction

does not constitute personal involvement in a constitutional violation.   *Joyner v. Greiner,* 195 F.

Supp. 2d 500, 506 (S.D.N.Y. 2002).  Therefore, I recommend that all of Plaintiff's claims against

Defendant Selsky be dismissed for lack of personal involvement.

**P.    Pendent State Claims**

Broadly read, Plaintiff's complaint alleges that actions of some Defendants constituted the tort of assault and battery under New York law. (Am. Compl. ¶¶ 70-74.)  Defendants claim that New York State Corrections Law § 24 absolves them of liability for state law claims in federal court.(Def.'s Br. at 25.)  Section 24 of New York's Correction Law provides as follows:

> 1.    No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.
>
> 2.    Any claim for damages arising out of any act done or the failure to perform any act  within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

Effectively, this statute precludes inmates from bringing civil suits against "corrections officers in their personal capacities" in state courts. *Cepeda v. Coughlin,* 128 A.D.2d 995, 997 (3d Dep't 1987). "In applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir. 1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Baker,* 77 F.3d at 15.

In 2009, the United States Supreme Court held that §24 is unconstitutional to the extent that it precludes inmates from pursuing §1983 actions.  *Haywood v. Drown*, __ U.S. __, 129 S. Ct.

2108 (2009).  However, at least two judges in this District have observed that because *Haywood*'s

focus is on concerns about civil rights claims and the Supremacy Clause, the decision "does not

affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law

claim." *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist. LEXIS 10799, 2010 WL 502762, at *

18 (N.D.N.Y. Feb. 8, 2010) (Kahn, J. and Peebles, M.J.); *May v. Donneli*, No. 9:06-CV-437, 2009

U.S. Dist. LEXIS 85495, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J. and

Treece, M.J.).[37]  Therefore, I recommend that Defendants' motion for summary judgment be

granted with respect to Plaintiff's pendent state claims.

## II.    PLAINTIFF'S MOTION TO AMEND

On April 9, 2008, plaintiff sought leave to file an amended complaint naming four

additional defendants.  (Dkt. No. 52.)  The proposed amended complaint identified the two "John

Doe" defendants and named two additional defendants (Deleo and Matthews) based upon

information obtained in discovery indicating that these two individuals (and not defendant Torres)

were involved in the January 27, 2005, urine-and-feces throwing incident.  *Id*. at 1-2.[38]  Upon due

consideration, the Court granted plaintiff's motion to amend.  (Dkt. No. 56.)

Plaintiff now moves to file a second amended complaint.  (Dkt. No. 84.)  Specifically, he

seeks to amend his complaint to assert claims arising out of disciplinary proceedings in December,

2005.  (Dkt. No. 87.)  In his proposed amended complaint, plaintiff includes these new allegations

---

[37]     The Court will provide Plaintiff with a copy of these unpublished decisions in
accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

[38]  Defendants opposed the requested amendments.  (Dkt. No. 54.)

in paragraphs 69 and 70.  See Dkt. No. 84-2 at 19-20.  In paragraph 69, plaintiff references a misbehavior report issued on December 17, 2005, by CO Carrasquillo, who is not a defendant in this action.  Paragraph 70 relates to a misbehavior report filed on December 17, 2005, by Sgt. Krein, who is not a defendant in this action, and the disciplinary hearing on those charges held on December 27, 2005.[39]  Both of the December 2007 disciplinary hearings were conducted by Hearing Officer Drown, who is not a defendant in this action. Plaintiff alleges that Defendant Selsky affirmed Drown's decisions "knowing of the violations."  Because Plaintiff does not seek to add Carasquillo, Krein, or Drown as Defendants, it appears that Plaintiff wishes to amend his complaint solely to assert that Defendant Selsky violated his constitutional rights by failing to administratively reverse Drown's determinations.[40]  This assumption is bolstered by Plaintiff's motion to amend, which states that Plaintiff wishes "to add the two ... dispositions ... to this complaint *against defendant Donald Selsky*."  (Dkt. No. 84 ¶ 3.)

Defendants have opposed the motion and filed a court-ordered sur-reply.  (Dkt. Nos. 86 and 90.)  Plaintiff has responded to Defendants' briefs.  (Dkt. No. 91.)

### A.      Legal Standard Governing Motions to Amend

The decision to grant or deny a motion to amend is committed to the sound discretion of the trial court and the court's decision is not subject to review on appeal except for abuse of discretion.  *Nettis v. Levitt*, 241 F.3d 186, 192 (2d Cir. 2001).  A motion to amend a pleading is governed by Rule 15 of the Federal Rules of Civil Procedure, which states that leave to amend

---

[39]  Plaintiff was sentenced to 42 months SHU confinement.

[40]  According to plaintiff the Court of Appeals affirmed these determinations in June and October, 2007.

shall be "freely given when justice so requires." Fed. R. Civ. Proc. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993). A motion to amend may properly be denied where the non-moving party has demonstrated prejudice or bad faith, or where the requested relief would be futile. *Foman, supra*, 371 U.S. at 182. As the Second Circuit has ruled:

> In determining what constitutes "prejudice," we consider whether the assertion of the new claim would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."

*Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993) (citation omitted). A proposed amended complaint seeking to assert a claim that is barred by the statute of limitations is futile and must be denied. *Malesko v. Correctional Services Corp.*, 229 F.3d 374, 382-84 (2d Cir. 2000), *rev'd on other grounds*, 534 U.S. 61 (2001); *Davis v. Trojer*, No. 99 Civ. 11056, 2001 U.S. Dist. LEXIS 10193, 2001 WL 829872, at *3 (S.D.N.Y. July 20, 2001).[41] Similarly, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citations omitted).

B.      **Analysis**

The Court finds that granting leave to amend at this time would result in "undue prejudice

---

[41]     The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

to the opposing parties," thereby warranting the denial of plaintiff's motion to amend. See *Foman*, 371 U.S. at 182. The Second Circuit has stated that "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Parker v. Columbia Pictures Industries*, 204 F.3d 326, 340 (2d Cir. 2000). The deadline for filing non-dispositive motions is long expired; indeed the dispositive motion filing deadline was November 13, 2008. (Dkt. No. 72.) Moreover, any claims plaintiff might have wished to assert relating to these two disciplinary proceedings existed at the time he filed his first motion to amend in April 2008. Plaintiff offers no explanation for his failure to include these claims in that amended complaint.

Moreover, amendment would be futile. As discussed above in Section I(O)(5), Plaintiff's allegations that Defendant Selsky violated his constitutional rights by affirming disciplinary convictions fails to state a claim under 1983. Therefore, Plaintiff's motion to amend is denied.

## III.   PLAINTIFF'S MOTION TO APPOINT COUNSEL

Plaintiff moves for the appointment of counsel. (Dkt. No. 93.) Defendants have not opposed the motion.

Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion. Among these factors are:

> The indigent's ability to investigate the crucial facts, whether
> conflicting evidence implicating the need for cross examination will

> be the major proof presented to the fact finder, the indigent's ability
> to present the case, the complexity of the legal issues and any special
> reason in that case why appointment of counsel would be more likely
> to lead to a just determination.

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)).  This is not to say that all, or indeed any, of these factors are controlling in a particular case.  Rather, each case must be decided on its own facts.  *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (citing *Hodge*, 802 F.2d at 61).

A review of the file reveals that (1) the case does not present novel or complex issues and (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action.  For example, as discussed above, several of Plaintiff's claims should survive Defendants' motion for summary judgment.  While it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by pro se litigants, "this factor alone is not determinative of a motion for appointment of counsel."  *Velasquez*, 899 F. Supp. at 974.  Furthermore, <u>it is highly probable that this Court will appoint trial counsel at the final pretrial conference</u>.  Finally, this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 75) be **<u>GRANTED IN PART AND DENIED IN PART</u>**.

It is **RECOMMENDED** that Defendants' motion be granted as to the following claims:

(1) the Eighth Amendment excessive force claim against Defendant Jewett; (2) the failure-to-intervene claims against Defendants McCarthy, Matthews, and Deleo; (3) the due process claim against Defendants Farrell and T.J. Brown regarding the destruction of personal property; (4) the access-to-courts claim against Defendants McCarthy and Torres; (5) the free speech claim against Defendants McCarthy and Torres; (6) the excessive force claim against Defendant Farrell regarding the tobacco-spitting incident; (7) the claim that Defendants Eagen, Miller, K. Lucas, and T. Lucas wrongfully restricted Plaintiff's ability to file grievances; (8) the Eighth Amendment medical care claim against Defendants Sisilli and Riester; (9) the Eighth Amendment conditions of confinement claim against Defendants Miller, W. Brown, and Healy regarding recreation periods; (10) the retaliation claim against Defendants Miller, W. Brown, and Healy regarding recreation periods; (11) the First Amendment claim against Defendant Miller regarding Kosher meals; (12) the claim that Defendants DiCairano and Leghorn violated Plaintiff's constitutional rights by using racial epithets; (13) the Eighth Amendment excessive force claim against Defendant Leghorn; (14) the Eighth Amendment medical care claims against Defendants W. Brown, Gusman, and Inaganti regarding Plaintiff's shoulder surgery; (15) the Eighth Amendment medical care claim against Defendant Gusman regarding Plaintiff's vision issues; (16) the claims regarding constant cell illumination and ventilation in the SHU; (17) any claim against Defendant Healy for conducting a disciplinary hearing on October 28, 2005; (18) all claims against Defendant Selsky; and (19) Plaintiff's pendent state law claims. These claims should be dismissed; and it is further

**RECOMMENDED** that Defendants' motion be denied as to the following claims: (1) the Eighth Amendment excessive force claim against Defendants Sisilli and Riester; (2) the Eighth Amendment excessive force claim against Defendant T.J. Brown; (3) the Eighth Amendment

excessive force claim against Defendant Occhipinti; (4) the failure to intervene claim against Defendant DiCairano; and (5) the procedural due process claim against Defendant Healy regarding the hearing on the November 15 misbehavior report.  These claims should proceed to trial; and it is further

**RECOMMENDED** that the Court dismiss the following claims *sua sponte*: (1) the supervisory liability claims against Defendant Miller regarding the urine-and-feces throwing incident and the mail tampering incident; (2) the failure-to-investigate claims against Defendant Griffin regarding the urine-and-feces throwing incident and the mail tampering incident; (3) the retaliation claim against Defendants McCarthy and Torres regarding the mail tampering incident; (4) the Eighth Amendment medical care claim against Defendant Farrell regarding the tobacco-spitting incident; (5) the claim that Defendants K. Lucas, W. Brown, and Eagen failed to properly process Plaintiff's grievances regarding the denial of Kosher meals; (6) the retaliation and due process claims against Defendants Gusman, Griffin, Healy, Sisilli, and Riester regarding the March 1, March 2, June 27, October 11, October 12, and October 16 misbehavior reports and the disciplinary hearings that followed them; (7) the retaliation claim against Defendant Occhipinti regarding the October 15 misbehavior report; and (8) the retaliation claims against Defendants Griffin and Healy based upon their conduct during disciplinary hearings; and it is further

**RECOMMENDED** that the Court find that the following claims survive *sua sponte* review: (1) the retaliation claim against Defendant T. J. Brown; and (2) the retaliation claim against Defendants Occhipinti and DiCairano.  These claims should proceed to trial; and it is further

**ORDERED** that Plaintiff's motion to file a second amended complaint (Dkt. No. 84) is

**DENIED**; and it is further

**ORDERED** that Plaintiff's renewed motion to appoint counsel (Dkt. No. 93) is **DENIED**

**WITHOUT PREJUDICE**; and it is further

**ORDERED** that the Clerk serve copies of *Fackler v. Dillard*, No. 06-10466, 2006 U.S.

Dist. LEXIS 61480, 2006 WL 2404498  (E.D. Mich. Aug. 16, 2006); *Benitez v. Ham,* No. 9:04-

CV-1159, 2009 U.S. Dist. LEXIS 97495, 2009 WL 3486379 (N.D.N.Y. Oct. 21, 2009) ; *Morrison*

*v. Mamis,* 2008 U.S. Dist. LEXIS 106416, 2008 WL 5451639, at *7 (S.D.N.Y. Dec. 18, 2008);

*Hamilton v. Smith,* No. 06-CV-805 (GTS/DRH), 2009 U.S. Dist. LEXIS 91032, 2009 WL

3199531, at *16 (N.D.N.Y. Jan. 13, 2009); *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist.

LEXIS 10799, 2010 WL 502762 (N.D.N.Y. Feb. 8, 2010); *May v. Donneli*, No. 9:06-CV-437,

2009 U.S. Dist. LEXIS 85495, 2009 WL 3049613 (N.D.N.Y. Sept. 18, 2009); and *Davis v. Trojer*,

No. 99 Civ. 11056, 2001 U.S. Dist. LEXIS 10193, 2001 WL 829872, at *3 (S.D.N.Y. July 20,

2001) on Plaintiff in accordance with the Second Circuit's decision *LeBron v. Sanders*, 557 F.3d

76 (2d Cir. 2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN  DAYS WILL**

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated: March 31, 2010
        Syracuse, New York

                                        George H. Lowe
                                        United States Magistrate Judge

97